THE ARROW-HART & HEGEMAN ELECTRIC COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9045. Promulgated December 19, 1946.

*W. C. Magathan, Esq., Philip Bardes, Esq.,* and *J. Marvin Haynes, Esq.,* for the petitioner.

*Arnold R. Cutler, Esq.,* and *James T. Haslam, Esq.,* for the respondent.

HARLAN, *Judge*: The respondent determined deficiencies in income tax, declared value excess profits tax, and excess profits tax, as follows:

| Year | Tax | Deficiency |
|---|---|---|
| 1940 | Excess profits tax | $30,923.24 |
| 1941 | Income tax | 2,092.74 |
| 1941 | Declared value excess profits tax | 2,237.55 |
| 1941 | Excess profits tax | 27,124.93 |

In an amended petition filed at the trial, petitioner alleged an overpayment of excess profits tax in the amount of $7,032.14 for the calendar year 1940 as shown on claim for refund filed with the collector of internal revenue for the district of Connecticut on March 25, 1944. Also, in the amended petition petitioner alleges further overpayment of excess profits tax and interest for the calendar year 1940 and overpayments of income, declared value excess profits, and excess profits taxes and interest for the calendar year 1941 aggregating $67,265.31, being payments in whole or in part of the deficiencies stated in the deficiency notice, and that these payments were made to the collector of internal revenue for the district of Connecticut on September 28, 1945, after the mailing of the notice of deficiency and the filing of the original petition on August 30, 1945.

The questions presented for our determination are:

(1) Is any portion of dividends on stocks of a foreign subsidiary corporation, constituting net abnormal income under section 721 of the Internal Revenue Code, received by the petitioner in the taxable year 1940, allocable to the taxable year 1940 for purposes of determining the excess profits tax net income?

(2) Should that part of the chapter 1 tax which is chargeable to the abnormal income attributable to prior years be allowed as a deduction in computing the excess profits net income for the year 1940?

(3) Is the city of Hartford special assessment of school tax for the year 1937 abnormal as to class, for which adjustment may be made in the computation of excess profits tax credit?

(4) In computing the excess profits tax credit for the year 1940, should income for the base period years 1937 and 1938 be adjusted for property taxes paid in those years?

(5) In computing the excess profits tax credit for the years 1940 and 1941, should income for the base period year 1937 be adjusted for amounts paid as pensions, sickness pay, severance allowance, and payments to widows?

(6) In computing the excess profits tax credit for the years 1940 and 1941, should the income for the base period years 1937, 1938, and 1939 be adjusted for interest paid in those years on a note issued July 1, 1937?

Petitioner is a corporation organized on December 31, 1928, under the laws of the State of Connecticut, pursuant to an agreement of consolidation or merger among the Arrow Electric Co., the Hart & Hegeman Manufacturing Co., the Arrow Manufacturing Co., and the H. & H. Electric Co. Its tax returns for the calendar years 1940 and 1941, the period here involved, were filed with the collector of internal revenue for the district of Connecticut. It kept its books and filed its returns on the accrual basis.

Since incorporation, petitioner has been engaged in the manufacture and distribution of electrical products. Its principal office and factory have been located in Hartford, Connecticut.

## *Issue No. 1.*

### FINDINGS OF FACT.

Arrow-Hart & Hegeman (Canada), Ltd., (hereinafter called the Canadian subsidiary) is a corporation organized in 1932 under the laws of the Dominion of Canada. Since incorporation it has been a wholly owned subsidiary of the petitioner, and it is not a foreign personal holding company. At all times since incorporation both the petitioner and the Canadian subsidiary have kept their books and made their income and excess profits tax returns on the calendar year basis under the accrual method.

Petitioner computed its excess profits net income for the calendar year 1940 under the income credit method.

The Canadian subsidiary is a manufacturer of electrical wiring devices and is located in Toronto, Canada.

On March 15, 1940, the petitioner received a dividend from the Canadian subsidiary in the United States dollar amount of $191,551.92,

which dividend was the first ever paid by the Canadian subsidiary. This dividend was the only dividend received by the petitioner from a foreign corporation in the calendar year 1940 and no dividends from a foreign corporation were received by the petitioner prior to the year 1940. The dividend was paid pursuant to a resolution of the board of directors of the Canadian subsidiary adopted on March 7, 1940, as follows:

VOTED: That a dividend out of earned surplus of $194,029.40 be paid March 15, 1940 to stockholders of record at the close of business March 8, 1940 in the following manner:
$169,029.40 by means of a credit note or notes and $25,000 in cash.

Said dividend of $194,029.40 in Canadian funds amounted to $191,-551.92 in United States funds, consisting of a credit for $169,029.40 plus $22,522.52 cash, the latter being the United States equivalent of 25,000 Canadian dollars converted at the official rate of exchange prevailing on March 15, 1940.

Under the law of Canada in effect at the time said dividend was declared and paid, the transfer of cash, credits, or securities out of the Dominion of Canada was prohibited except upon the approval by the Dominion's Foreign Exchange Control Board.

Under date of February 7, 1940, the foreign subsidiary filed an application with the Foreign Exchange Control Board for permission to transfer out of Canada a dividend of $194,029.40, out of its accumulated earnings at December 31, 1939. The board gave the required approval under date of February 14, 1940. Of the dividend paid on March 15, 1940, the board charged $153,618.98 to earnings accumulated at December 31, 1938, being the amount owed by petitioner to its subsidiary on that date, and the balance, $40,410.42, to current earnings for the calendar year 1939.

The transfer of the credit of $169,029.40 in partial payment of said dividend was effected through the issuance by the Canadian subsidiary to the petitioner of the former's credit note dated March 15, 1940, crediting said amount against the balance of like amount in the intercompany account at December 31, 1939. The balance owing to the Candian subsidiary by the petitioner in said intercompany account at December 31, 1939, viz., $169,029.40, arose through current transfers of earnings by the Canadian subsidiary after organization to the petitioner without the formality of dividend declarations.

The accumulated earnings of the Canadian subsidiary at December 31, 1938 and 1939, were as follows, as shown in reports of the company's independent auditors: December 31, 1938, $368,999.96, and December 31, 1939, $436,575.52.

In the report of the company's independent auditors for the calendar year 1940 the earned surplus account of the Canadian subsidiary is stated thus:

Earned surplus as at January 1, 1940_____ $436,575.52

Less:

    Dividend paid to Arrow-Hart & Hegeman Electric Co. of which
    $169,029.40 was applied against the intercompany account and
    $25,000.00 was paid in Canadian funds_____ 194,029.40

                                                         $242,546.12

Add:

    Net Profit from Operations for year ended December 31, 1940___ 57,339.05

Earned Surplus as at December 31, 1940_____$299,885.17

The earnings and profits of the Canadian subsidiary for the period January 1 to March 15, 1940, stated in Canadian dollars, were $11,489.54. The United States dollar amount of the earnings and profits of the Canadian subsidiary for the period January 1 to March 15, 1940, was $10,350.94, converted at the official rate of exchange prevailing on March 15, 1940.

The earnings and profits of the Canadian subsidiary for each of the calendar years 1937 to 1940, inclusive, were as follows, stated in United States dollar amounts:

    1940_____ $58,837.09
    1939_____ 57,860.89
    1938_____ 53,798.27
    1937_____ 79,944.90

There were no direct costs or expenses deductible in determining the normal tax net income of the petitioner for the calender year 1940, through the expenditure of which said dividend of $191,551.92 was in whole or in part derived.

For the purpose of determining the excess profits net income, the amount of $191,551.92 received by petitioner from its Canadian subsidiary is net abnormal income within the meaning of sections 721 (a) (2) (F) and (3) of the Internal Revenue Code.

OPINION.

In computing its excess profits net income under the income credit method in its return for 1940, petitioner deducted as abnormal income attributable to other years the sum of $180,790.09. A schedule attached to the return disclosed that petitioner arrived at this amount in the following manner:

Allocated to the year 1940, an amount equal to the net income of the foreign corporation for the period from January 1 to March 15, 1940, or 2-2/12ths of its net income for the year_____ $10,761.83

Allocated to the year 1939, an amount equal to the net income of the foreign corporation for that year_____ $60,236.81

Allocated to the year 1938, an amount equal to the net income of the foreign corporation for that year_____ 53,922.54

Allocated to the year 1937, the balance of the dividend__ 66,630.74

Abnormal income attributable to other years_____ 180,790.09

Total amount of net abnormal income_____ $191,551.92

The respondent determined that the portion of the $191,551.92 dividend equal to the net earnings of the Canadian subsidiary for the year 1940, viz., $58,837.09, should be attributed to the taxable year 1940, and in computing the amount of the deficiency he added $48,-075.26 to the amount of excess profits net income shown in petitioner's return.

The petitioner now contends that no portion of the dividend of $191,551.92 received by it on March 15, 1940, from its Canadian subsidiary is attributable to the calendar year 1940, and that all of this dividend is attributable to prior taxable years for the purposes of section 721. In the alternative, petitioner contends that if any portion of the dividend is attributable to the calendar year 1940, the amount so attributable is not in excess of $10,350.94, the amount of the earnings and profits of the Canadian subsidiary for the period January 1 to March 15, 1940.

The respondent contends that the amount of dividends received from the Canadian subsidiary in 1940, equal to the earnings or profits of the subsidiary for such year, should be allocated to the taxable year 1940, for purposes of determining the excess profits net income.

The pertinent provisions of section 721 of the code relating to abnormal income, are set forth in the margin.[1]

---

[1] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

* * * * * * *

(F) Income consisting of dividends on stock of foreign corporations, except foreign personal holding companies.

All the income which is classifiable in more than one of such subparagraphs shall be classified under the one which the taxpayer irrevocably elects. The classification of income of

The parties are in agreement that the dividend of $191,551.92 received by petitioner from the Canadian subsidiary constitutes abnormal income and that it falls within the class of abnormal income defined in sections 721 (a) (2) (F). They also agree that the full amount of the dividend constitutes "net abnormal income" as defined in section 721 (a) (3). They disagree as to the method to be used in determining the amount of the dividend attributable to the calendar year 1940, if any, and the amount attributable to prior taxable years pursuant to the provisions of section 721 (b).

Section 721 (b) provides that the amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary.

The pertinent regulations are Regulations 109, as amended by T. D. 5045, 1941–1 C. B. 69. In so far as here material, they are set forth in the margin.[2]

---

any class not described in subparagraphs (A) to (F), inclusive, shall be subject to regulations prescribed by the Commissioner with the approval of the Secretary.

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. * * *

(c) COMPUTATION OF TAX FOR CURRENT TAXABLE YEAR.—The tax under this subchapter for the taxable year, in which the whole of such abnormal income would without regard to this section be includible, shall not exceed the sum of:

(1) The tax under this subchapter for such taxable year computed without the inclusion in gross income of the portion of the net abnormal income which is attributable to any other taxable year, and

* * * * * * *

[2] SEC. 30.721–3. *Amount attributable to other years.*—The mere fact that an item includible in gross income is of a class abnormal either in kind or in amount does not result in the exclusion of any part of such item from excess profits net income. It is necessary that the item be found attributable under these regulations in whole or in part to other taxable years. Only that portion of the item which is found to be attributable to other years may be excluded from the gross income of the taxpayer for the year for which the excess profits tax is being computed.

Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events. * * *

* * * * * * *

Specific methods of treating items of net abnormal income of the six classes specified in section 721 (a) are set forth in sections 30.721–6 to 30.721–11. These methods are to be applied subject to the provisions of this section.

* * * * * * *

SEC. 30.721–11. *Dividends on stock of foreign corporations other than foreign personal holding companies.*—The sixth class of potentially abnormal income specifically set forth in section 721 (a) (2) is dividends on stock of foreign corporations, except foreign personal holding companies. * * *

Items of net abnormal income of the class herein described are to be attributed to the years in which were accumulated the earnings and profits out of which the distributions

Section 721 is a relief provision. It was intended to prevent unfair application of the excess profits tax in abnormal cases. H. Rept. 2333, 77th Cong., 1st sess., p. 21. In so far as this section relates to dividends received from foreign corporations, the intention of Congress was to exclude from the gross income of the taxpayer, for the year for which the excess profits tax is computed, the amount of any abnormal dividend paid during the taxable year out of earnings of a prior year or years accumulated prior to the incidence of the excess profits tax. See sec. 721 (c). The regulations promulgated by the Commissioner pursuant to the authority vested in him in section 721 (b) (secs. 30.721–3 and 30.721–11 of Regulations 109, hereinbefore set forth) appear (with the exception of the "Example" in section 30.721–11) to constitute a bona fide attempt on the part of the Commissioner to carry out the Congressional intent, for section 30.721–3 provides that "Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events," and section 30.721–11 that "Items of net abnormal income of the class herein described are to be attributed to the years in which were accumulated the earnings and profits out of which the distributions were made * * *." Moreover, we do not think that the last sentence of section 30.721–11, when intelligently read, conflicts with the sentences above quoted or with the Congressional intent, for it provides that "The earnings and profits out of which any distribution is made are, as provided in section 115, the most recently accumulated earnings and profits," thus forestalling any attempt on the part of a taxpayer to avoid tax liability by specifying that a distribution should be made out of earnings of other years when earnings of the taxable year have accumulated and are available for distribution. The provision of section 115 of the code which states that "every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits," is subsection (b).

---

were made, if accumulated after the acquisition by the distributee of the stock of the distributing corporation. * * * The earnings and profits out of which any distribution is made are, as provided in section 115, the most recently accumulated earnings and profits.

This section may be illustrated by the following example:

*Example.* The X Corporation, a domestic corporation, computing its excess profits credit on the income basis, acquired in 1938 all of the stock of the Y Company, Ltd., a foreign corporation, which is not a foreign personal holding company. The Y Company, Ltd., paid in July, 1940, a dividend to the X Corporation in the amount of $100,000. The X Corporation did not previously receive dividends from this or any other foreign corporation. In 1940 there were no direct costs or expenses attributable to the receipt of this dividend. The $100,000 is therefore a single item of net abnormal income. The Y Company, Ltd., had earnings and profits of $75,000 in 1940 and $125,000 in 1939. Following principles of existing law with respect to the source from which dividends are deemed to have been paid, the $100,000 item of net abnormal income shall be allocated between the years 1940 and 1939 in the respective sums of $75,000 and $25,000. See section 115 (b) and corresponding provisions of prior revenue laws. For method of computation of the excess profits tax for the year 1940, see section 30.721–4 and the example in section 30.721–6.

The meaning of the term "most recently accumulated earnings or profits" is well stated in Law of Federal Income Taxation, by Mertens, vol. 1, sec. 9.31, p. 464, as follows:

*Meaning of "Most Recently" Accumulated Earnings or Profits.* The statute aids the determination as to the source of the distribution * * * by specifying a presumption to the effect that every distribution is out of the most recently accumulated earnings or profits. Calculation of the most recently accumulated earnings or profits imports the inclusion of earnings or profits of the current year to the date of distribution: in other words, earnings or profits accumulated at the close of the year preceding the year of payment of a dividend are to be increased or diminished, as the case may be, by any earnings or profits or losses arising during the current year to the date of payment of the dividend.

The same author (*id.*, sec. 9.32, p. 467) also makes the following pertinent statement:

In ascertaining the extent to which current earnings increase the accumulated earnings, certain general rules have been applied as follows:

(1) If the books of account of the corporation clearly show its actual earnings between the close of the preceding taxable year and the date of the distribution, those earnings must be regarded as first distributed.

The Canadian subsidiary made only one dividend distribution during 1940 or prior thereto, viz., the dividend of $191,551.92, declared and paid on March 15, 1940. On that date the subsidiary had earnings and profits accumulated during the period January 1 to March 15, 1940, in the amount of $10,350.94. As we read and construe sections 30.721–3 and 30.721–11 of the respondent's regulations, *supra*, they authorize the exclusion by the petitioner, in computing his excess profits net income for the taxable year 1940, of the sum of $181,199.98, i. e., the difference between the earnings accumulated from January 1 to March 15, 1940, $10,350.94, and the dividend declared and paid on the latter date, $191,551.92.

In support of his contention that all of the earnings of the Canadian subsidiary for the year 1940 should be allocated to that year for purposes of determining the excess profits net income, the respondent stresses the provisions of section 721 (b) that the amount of net abnormal income that may be attributable to any previous taxable year is to be determined under regulations prescribed by him with the approval of the Secretary. He argues that the regulations promulgated under the authority thus given are those set forth in section 30.721–11, *supra;* that these regulations state that the "earnings and profits out of which any distribution is made are, as provided in section 115, the most recently accumulated earnings and profits"; that section 115 defines a "dividend" to mean "any distribution made by a corporation to its shareholders * * * (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year with-

out diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made" (sec. 115 (a), I. R. C.) ; that section 115 (b) of the code deals with the source of the distribution, and the regulations promulgated under this section (sec. 119.115–2, Regulations 103)[3] provide that in "determining the source of a distribution, consideration should be given first, to the earnings or profits of the taxable year" and that "earnings or profits of the taxable year" are to be "computed as of the close of the year without diminution by reason of any distributions made during the year and without regard to the amount of earnings or profits at the time of the distribution"; and that the petitioner has been given the relief provided by Congress in section 721, in accordance with Congressional intent, since as a result of that section only $58,837.09 out of a total of $191,551.92, was found to be taxable for the year 1940 for excess profits tax purposes.

The respondent's interpretation of 30.721–11 ignores the provision of 30.721–3 that the specific method of treating dividends on stock of foreign corporations in 30.721–11 is "to be applied subject to the provisions" of 30.721–3 that "Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events." Moreover, he would construe the last sentence of 30.721–11 as though it read, "The earnings and profits out of which any distribution is made are to be determined as provided in section 115 and regulations promulgated thereunder," whereas it

[3] SEC. 19.115–2. *Sources of distributions in general.*—For the purpose of income taxation every distribution made by a corporation is made out of earnings or profits to the extent thereof and from the most recently accumulated earnings or profits. In determining the source of a distribution, consideration should be given *first,* to the earnings or profits of the taxable year; *second,* to the earnings or profits accumulated since February 28, 1913, only in the case where, and to the extent that the distributions made during the taxable year are not regarded as out of the earnings or profits of that year; *third,* to the earnings or profits accumulated prior to March 1, 1913, only after all the earnings or profits of the taxable year and all the earnings or profits accumulated since February 28, 1913, have been distributed; and, *fourth,* to sources other than earnings or profits only after the earnings or profits have been distributed.

If the earnings or profits of the taxable year (computed as of the close of the year without diminution by reason of any distributions made during the year and without regard to the amount of earnings or profits at the time of the distribution) are sufficient in amount to cover all the distributions made during that year, then each distribution is a taxable dividend. (See section 19.115–1.) If the distributions made during the taxable year exceed the earnings or profits of such year, then that proportion of each distribution which the total of the earnings or profits of the year bears to the total distributions made during the year shall be regarded as out of the earnings or profits of that year. The portion of each such distribution shall be considered a taxable dividend to the extent of the earnings or profits accumulated since February 28, 1913, and available on the date of the distribution. In any case in which it is necessary to determine the amount of earnings or profits accumulated since February 28, 1913, and the actual earnings or profits to the date of a distribution within any taxable year (whether beginning before January 1, 1936, or, in the case of an operating deficit, on or after that date) cannot be shown, the earnings and profits for the year (or accounting period, if less than a year) in which the distribution was made shall be prorated to the date of the distribution not counting the date on which the distribution was made.

reads, "The earnings and profits out of which any distribution is made are, as provided in section 115, the most recently accumlated earnings and profits." If this sentence is susceptible of the construction placed upon it by respondent, then we are of the opinion that it is invalid and conflicts with the provision of 30.721-3 above quoted, which clearly expresses the intent of Congress. A regulation which "operates to create a rule out of harmony with the statute, is a mere nullity. * * * And not only must a regulation, in order to be valid, be consistent with the statute, but it must be reasonable." *Manhattan General Equipment Co.* v. *Commissioner*, 297 U. S. 129.

In reaching this conclusion we have not overlooked that Congress, for income tax purposes, included in the definition of dividend any distribution made "out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made." (Sec. 115 (a) (2).) This provision was originally inserted in the statute with the object of granting relief to deficit corporations from the undistributed profits surtax by giving them the benefit of a dividends paid credit to the extent of the current year's earnings distributed. Senate Finance Committee Rept. No. 2156, p. 18, 74th Cong., 2d sess.[4] "As respects such dividends," the Senate Finance Committee said, "the complicated determination of accumulated earnings or profits is rendered unnecessary." In enacting section 115 (a) (2) Congress was not concerned with the amount of any particular dividend that was attributable to earnings accumulated in other years, and it gave relief irrespective of the amount of earnings accumulated at the time a dividend was declared and paid and to the extent of the current year's earnings which were distributed. Under section 721, the determination of the amount of abnormal income attributable to other years is of paramount importance in order to grant the relief sanctioned by Congress, and the regulations correctly prescribe that abnormal dividends must be attributed to the years in which were accumulated the "earnings and profits *out of*

---

[4] "It is recommended that relief be provided for the corporation which, while having an adjusted net income for the taxable year, lacks sufficient accumulated earnings and profits as of the close of the taxable year from which to distribute taxable dividends equal to the adjusted net income. * * *" [Ways and Means Committee, 74th Cong., 2d sess., H. R. Rept. Mar. 26, 1936, p. 6.]

In order to enable corporations without regard to deficits existing at the beginning of the taxable year to obtain the benefit of the dividends paid credit for the purposes of the undistributed profits surtax, section 115 (a) changes the definition of a dividend so as to include distributions out of the earnings or profits of the current taxable year. The amendment simplifies the determination by providing that distributions during the year, not exceeding in amount the current earnings, are dividends constituting taxable income to the shareholder and a dividends paid credit to the corporation. As respects such dividends the complicated determination of accumulated earnings or profits is rendered unnecessary. [Senate Finance Committee, 74th Cong., 2d sess., S. Rept. No. 2156, p. 18.]

*which the distributions were made.*" Obviously, the dividend received by petitioner from its foreign subsidiary on March 15, 1940, did not have its origin in and was not attributable to any earnings accumulated in 1940, after the date this dividend was declared and paid, as such earnings had not been accumulated and were not in existence on that date. They were not and could not have been the "earnings and profits out of which the distributions were made." The earnings out of which the dividend distribution was made, therefore, must have been those which the foreign subsidiary had accumulated on and prior to March 15, 1940.

The petitioner points to the events leading up to the declaration of the dividend on March 15, 1940, viz., the wartime controls imposed by the Dominion of Canada upon the export of cash; the necessity for Canadian companies to obtain a license from the Foreign Exchange Control Board for the payment of dividends to nonresidents of the Dominion of Canada; petitioner's application for a license to pay dividends in the amount of $191,551.92 out of accumulated earnings and profits at December 31, 1939; and the granting of this license. On the basis of these facts petitioner urges that, since the dividend of $191,551.92 was in fact paid out of earnings and profits of the Canadian subsidiary accumulated to December 31, 1939, and could not have legally been paid from other earnings, the entire amount of the dividend distribution is attributable to years prior to 1940.

We are unable to agree with petitioner. Neither the laws of Canada nor any action taken pursuant thereto are decisive of the question of how much of the dividend received by petitioner may be excluded from its gross income for excess profits tax purposes. The decisive factor is the will of Congress "and the expression of its will in legislation." *Burnet* v. *Harmel*, 287 U. S. 103. Congress, in section 721 (c), *supra*, had provided in effect that the amount of net abnormal income received by petitioner which is attributable to any other taxable year is excludible from gross income in determining excess profits net income, and, in section 721 (b), that the amount of net abnormal income attributable to any previous year or years shall be determined under regulations prescribed by the Commissioner, with the approval of the Secretary. Exercising the power thus conferred upon him, the Commissioner, in section 30.721–11, provided that "The earnings and profits out of which any distribution is made are * * * the most recently accumulated earnings and profits." On March 15, 1940, the Canadian subsidiary had accumulated earnings and profits in excess of the amount of $191,551.92 distributed as a dividend on that date. Of these earnings and profits, $10,350.94 had been accumulated during the period January 1 to March 15, 1940. This leaves a balance of

$181,199.98, representing the portion of the distribution attributable to earnings and profits of prior years, which is excludible from gross income for excess profits tax purposes.

*Issue No. 2.*

### FINDINGS OF FACT.

During the calendar year 1940 petitioner received a refund of corporation income taxes paid to the State of Connecticut for the calendar years 1937 to 1939, inclusive, aggregating $6,871.07, which amount constitutes net abnormal income attributable to said years 1937 to 1939, within the meaning of section 721 (a) (2) (A) and (3) of the Internal Revenue Code.

During the calendar year 1940 petitioner received a dividend from its Canadian subsidiary in the amount of $191,551.92, $181,199.98 of which (as decided in issue 1) was net abnormal income attributable to years prior to 1940.

The declared value excess profits tax of petitioner for the calendar year 1940 is $8,764.15 and its net income, for declared value excess profits tax computation for said year, is $1,296,821.97.

The normal tax of petitioner for the calendar year 1940 is $260,520.88 and its normal tax net income for said year is $1,273,552.92.

In its corporation excess profits tax return, Form 1121, petitioner claimed the right to deduct from its normal tax net income, in computing its excess profits net income, the amount of income and income defense taxes shown to be due on its corporation income, declared value excess profits, and defense tax return for 1940, Form 1120. On this return the amount due was computed as follows:

| | |
|---|---|
| 30. Net income for declared value excess-profits computation | $1,313,961.51 |
| 31. Less: Declared value excess-profits tax | 9,864.14 |
| 32. Net income | $1,304,097.37 |
| 33. Less: Interest on obligations of the U. S. | |
| 34. Adjusted net income | $1,304,097.37 |
| 35. Less: Dividends received credit | 14,504.90 |
| 36. Normal-tax net income | $1,289,592.47 |
| 37. Total income and income defense taxes | 309,502.19 |
| 38. Less: Credit for income taxes paid to a foreign country or United States possession allowed a domestic corporation | 42,058.71 |
| 39. Balance of income and income defense taxes | $ 267,443.48 |

### OPINION.

The respondent contends that in the computation of the petitioner's excess profits net income for the calendar year 1940 the deduction for

income and declared value excess profits taxes should be reduced by the amount of such taxes allocable to net abnormal income attributable under section 721 to prior taxable years. He suggests the following formula for arriving at the amount of such reduction:

$$\frac{\text{Abnormal income attributable to prior years}}{\substack{\text{Declared value excess profits tax net income,} \\ \text{line 30, Form 1120}}} \times \text{declared value excess profits tax} = \$X$$

$$\frac{\text{Abnormal income attributable to prior years}}{\text{Normal tax net income, line 36, Form 1120}} \times \text{income tax} = \$Y$$

$X plus $Y = $Z (Amount of tax to be subtracted from amount otherwise allowable in determining excess profits net income.)

The petitioner contends that the reduction is not warranted, because (1) the statute is explicit as to the specific adjustments to be made to normal tax net income in arriving at the excess profits net income for a taxable year beginning after December 31, 1939, and (2) the respondent's view, if upheld, has the effect of reducing the amount of relief intended under section 721.

In support of his contention the respondent relies upon sections 729 (a) and 24 (a) (5) of the Internal Revenue Code. Section 729 (a) provides that all provisions of law (including penalties) applicable in respect of the taxes imposed by chapter I (the income tax law) shall, "insofar as not inconsistent with this Subchapter [the subchapter on excess profits tax under chapter II], be applicable in respect of the tax imposed by this Subchapter." Section 24 (a) (5) of chapter I provides that in "computing net income no deduction shall in any case be allowed in respect of any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest * * * wholly exempt from the taxes imposed by this Chapter."

Respondent urges that, in determining the excess profits net income, section 24 (a) (5), read in conjunction with section 729 (a), results in limiting the deductions to those related to the taxed income, and that that part of chapter I tax which is chargeable to the abnormal income attributable to prior years should not be allowed as a deduction in computing the excess profits net income, for the reason that such abnormal income is itself excluded from excess profits tax for the year 1940. He states that the theory of the above mentioned provisions of the code, as applied to the instant case, is quite simple; that is, to the extent that a certain amount of income is in the first instance excluded from excess profits net income, as attributable to other years, the amount of chapter I tax based on such income should not be allowed as a deduction.

We are unable to agree with the respondent. For the calendar year 1940 the petitioner incurred income taxes and declared value

excess profits taxes, and the income upon which such taxes were imposed included the amount of the refund of Connecticut income taxes and the full amount of the dividend received from the Canadian subsidiary. The amount of such income taxes is, by virtue of the provisions of section 711 (a) (1) (A), as added to the code by the Second Revenue Act of 1940, a deduction in computing excess profits net income under the income credit method. Likewise, the amount of such declared value excess profits tax imposed by section 600 is, by virtue of section 23 (c) (1) of the code, as amended by section 506 (b) of the Second Revenue Act of 1940, a deduction in arriving at normal tax net income for the calendar year 1940 and hence in arriving at excess profits net income for such year.

In addition to the deduction for income taxes, section 711 (a) permits other deductions from normal tax net income in computing excess profits net income, such as long term capital gains, income from retirement or discharge of bonds, refunds and interest on Agricultural Adjustment Act taxes, and recoveries of bad debts. If the principle here contended for by the respondent is proper, its application would not be limited to cases in which excess profits tax is reduced pursuant to the provisions of section 721 because attributable to other years. Its application would be required in all cases in which the adjustments called for by section 711 (a) result in excluding from excess profits net income items of income included in normal tax net income. Thus, if capital gains are excluded under section 721 (a) (1) (B) the deduction for income taxes authorized by section 711 (a) (1) (A) would have to be reduced by the income tax attributable to such capital gains, and a similar reduction would have to be made if any income from retirement or discharge of bonds, refunds and interest on Agricultural Adjustment Act taxes, and recoveries of bad debts were excluded.

Section 729 (a), relied upon by the respondent, states that all provisions of law applicable in respect of the taxes imposed by chapter I, shall, *in so far as not inconsistent with this subchapter*, be applicable in respect of the tax imposed by this subchapter. We think the most obvious answer to the respondent's argument is that the application of section 24 (a) (5) to reduce the deduction allowable under section 711 (a) (1) (A) would be the application of section 24 (a) (5) in a manner that would be inconsistent with section 711 (a) (1) (A) of "this subchapter," i. e., the excess profits subchapter. Therefore, section 24 (a) (5) must yield, since the provisions of chapter I are expressly made applicable only in so far as not inconsistent with subchapter E. Moreover, we do not think it was ever the intention of Congress in enacting section 729 (a) that it should be used to incorporate into subchapter 2 E, a substantive provision such as section 24 (a) (5). The legislative history of section 729 (a) indicates that

it was the intention of Congress to make applicable to this excess profits tax only the administrative provisions of the income tax imposed by chapter I. This, we think, is apparent from the report of the Ways and Means Committee on the Second Revenue Bill of 1940 (H. R. Rept. No. 2894, 76th Cong., 3d sess., p. 29), which reads:

Section 727 (a)* makes applicable in respect of the excess-profits tax all provisions of law (including penalties) applicable in respect of the taxes imposed by Chapter 1 which are not inconsistent with the provisions of the bill. Examples of such provisions are provisions relating to the assessment and collection of deficiencies, claims for refund, periods of limitation on the assessment and collection of deficiencies or the allowance of refunds, the jurisdiction procedure, and powers of the Board of Tax Appeals, closing agreements, etc. [*Became 729 (a) in the bill as finally enacted.]

Section 729 (a) is not unique. Identical provisions for importing the administrative provisions of chapter I are found in section 508, relating to the personal holding company surtax, and section 702, relating to the unjust enrichment tax. In each case it is highly significant that the title adopted in the code for such sections is "Administrative Provisions." The reason for the use of the title "Laws Applicable" in the case of section 729 in lieu of "Administrative Provisions" is apparent from an examination of the section as a whole. Section 729 covers not only administrative rules in subsections (a) and (b), but also provisions relating to the foreign tax credit (see subsections (c) and (d).) An omnibus title therefore was required for section 729.

The foregoing discussion of sections 729 (a) and 711 (a) (1) (A) convinces us that Congress, in providing for deductions from normal tax net income in computing excess profits net income, was not concerned with the fact that the amount of the taxes allowed as a deduction was based in part upon some income that was excluded in the computation of excess profits net income. If the deduction for abnormal income attributable to other years was the only one involved, the respondent's argument might be more persuasive. As heretofore noted, it is not. The respondent is here contending for a rule directly *contra* to that employed in his own regulations in the example found in section 30.721–5 of Regulations 109, as amended by T. D. 5255, April 2, 1943, which contains no reference whatsoever to any possible adjustment in the amount of the deduction under section 711 (a) (1) (A) in respect of the income tax imposed under chapter I of the code. And in section 30.711 (a)–2 of Regulations 109, as amended by T. D. 5253, March 27, 1943, and T. D. 5092, October 21, 1941, the respondent states that the amount of the adjustment for taxes provided in section 711 (a) (1) (A) "is the amount of such tax after the allowance of the credit for foreign taxes as provided in Sections 31 and 131."

Our best judgment is that, if Congress had intended that the deductions for taxes be adjusted as respondent urges, it would have included

in section 711 (a) (1) (A) a provision to the effect that there should be excluded from the deduction for taxes provided therein the portion of such tax attributable to any income excluded pursuant to the provisions of other subparagraphs of this paragraph or attributable to other taxable years pursuant to the provisions of section 721. It did not do so, and, inasmuch as our function is to apply the law as written and not add to it, our decision on this issue is for the petitioner.

*Issues Nos. 3 and 4.*

### FINDINGS OF FACT.

During the calendar year 1937 the school districts of the city of Hartford, Connecticut, were consolidated, in the course of which each school district having a deficit upon its books made a special or additional assessment of taxes on property within such district and each school district having a surplus upon its books issued a credit therefor ratably to owners of property within such district.

On July 1, 1937, a special assessment of school taxes in the amount of $10,530.45 was levied against property owned by the petitioner in a deficit district. On this date the petitioner became entitled to a credit of $2,901.14 in respect of property owned by it in a surplus district.

Pursuant to the procedure adopted by the taxing authorities in the city of Hartford, as authorized by the taxing statutes of the State of Connecticut, the amount of said credit was offset against the amount of said special assessment and the net amount (after adjusting for discount on account of prepayment) of $7,314.49 was paid by the petitioner in April 1938. This amount was deductible for income and excess profits tax purposes in the calendar year 1937, as petitioner was on the accrual basis.

At no other time during the existence of the petitioner has there ever been assessed against it, or paid by it, a special school tax, nor has it ever previously received a credit of school taxes, similar to that mentioned above.

The assessed value of property of petitioner in the city of Hartford, Connecticut, for property tax purposes for each of the calendar years 1933 to 1941, inclusive, was as follows:

| Calendar year | Land and buildings | Autos | Furniture | Inventory | Machinery | Total assessed value |
|---|---|---|---|---|---|---|
| 1933 | $1,328,513 | $1,850 | $21,000 | $325,000 | $340,000 | $2,016,363 |
| 1934 | 1,328,513 | 1,659 | 21.000 | 325,000 | 340,000 | 2,016,172 |
| 1935 | 1,328,513 | 1,352 | 21,000 | 325,000 | 340,000 | 2,015,865 |
| 1936 | 1,400,826 | 1,350 | 21,000 | 325,000 | 340,000 | 2,088,176 |
| 1937 | 1,545,026 | 3,770 | 21,000 | 500,000 | 390,000 | 2,459,796 |
| 1938 | 1,545,026 | 1,990 | ------------ | 758,000 | 262,000 | 2,567,016 |
| 1939 | 1,545,026 | 895 | ------------ | 568,000 | 243,000 | 2,356,921 |
| 1940 | 1,553,226 | 2,656 | ------------ | 655,575 | 216,525 | 2,247,982 |
| 1941 | 1,562,976 | 4,680 | ------------ | 726,800 | 221,700 | 2,516,156 |

Property taxes assessed against petitioner by the city of Hartford and its political subdivisions on the basis of assessed values shown in the preceding paragraph, and deductible by petitioner in each of the calendar years 1933 to 1941, inclusive, were as follows:

| Calendar year | Tax rate per $1,000 | Tax | Discount | Net amount deductible |
|---|---|---|---|---|
| 1933 | $26.25 | $52,929.53 | $793.94 | $52,037.85 |
| 1934 | 26.70 | 53,831.79 | 807.48 | 53,024.31 |
| 1935 | 26.70 | 53,823.60 | 1,076.48 | 52,747.12 |
| 1936 | 26.70 | 55,754.30 | 1,115.09 | 54,639.21 |
| 1937 | 29.25 | 71,949.03 | 720.49 | 71,229.54 |
| 1938 | 29.25 | 75,085.22 | 720.84 | 74,334.38 |
| 1939 | 29.25 | 68,595.24 | | 68,595.34 |
| 1940 | 29.75 | 72,232.46 | | 72,232.46 |
| 1941 | 32.00 | 80,516.99 | | 80,516.99 |

The political subdivisions referred to in the preceding paragraph were the school districts of the city of Hartford in existence only prior to the year 1937 and which were consolidated in the year 1937. Neither the special assessment of school tax for the year 1937 in the amount of $10,530.45 nor the credit of school tax for such year in the amount of $2,901.14 is included in the amounts shown for the year 1937.

The type of property upon which the assessed values were based was the same for the special assessment as for other property taxes in the city of Hartford. The special assessment applied equally to all property owners in each school district.

Property taxes assessed against petitioner by other cities and towns in the United States for the years 1933 to 1938, inclusive, and 1940 and 1941, were as follows:

| | | | |
|---|---|---|---|
| 1933 | $1,151.29 | 1937 | $1,223.64 |
| 1934 | 945.16 | 1938 | 1,357.48 |
| 1935 | 1,229.19 | 1940 | 1,912.21 |
| 1936 | 976.13 | 1941 | 3,173.82 |

#### OPINION.

Petitioner makes two contentions, the first of which is that the special assessment of school tax for 1937 in the net amount of $7,314.49 constitutes a class of deduction abnormal for it under subparagraph (J) (i) of section 711 (b) (1),[5] and that the full amount thereof should be disallowed under this subparagraph as an abnormal deduction.

---

[5] SEC. 711. EXCESS PROFITS NET INCOME.

    \*        \*        \*        \*        \*        \*        \*

    (b) TAXABLE YEARS IN BASE PERIOD.—

    (1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments

The special assessment arose by reason of the fact that prior to 1937 there were separate school districts in the city of Hartford which were consolidated in 1937. Prior to the consolidation, each school district in the city of Hartford was a body corporate (sec. 977, ch. 53, General Statutes of Connecticut, 1930), and all the school taxes were levied by the school districts (sec. 1254, ch. 65, General Statutes of Connecticut, 1930). After consolidation, the school districts were abolished and the city of Hartford assumed control of the schools therein as though the city constituted a single school district (sec. 957, ch. 51, General Statutes of Connecticut, 1930). In connection with the consolidation the property of each school district was appraised and the amount of debts estimated. Taxpayers owning property in districts where the appraisal showed an excess in the appraised value of property over and above liabilities, received a credit, and a special assessment was levied against taxpayers owning property in so-called deficit districts. Petitioner owned property in a deficit district and as a result became liable in 1937 for an additional tax of $10,003.93. It also owned property in a surplus district and received a credit in 1937 of $2,756.08. The difference between these two amounts, $7,314.49, represents the additional tax in controversy.

While conceding that the consolidation of the school districts was an event which had never happened and might never happen again, the respondent urges that it does not follow that the special assessment constituted anything other than a property tax merely because there was an additional amount of property taxes for 1937; that the tax in question is no more abnormal as a class than any property tax for any particular year, whether levied formerly by a school district and treated as a property tax, or by the city of Hartford itself; that a property tax does 'not become abnormal as a class merely because the rate in mills for a particular year varies from that of another year; and that the special assessment undoubtedly would have been included in the "regular" tax bill, but for the single fact that, in placing all the school districts on an equal basis, the rate varied from one school district to another.

The petitioner maintains that the special school tax of $7,314.49 can not reasonably be classified with other taxes on property paid by it for the year 1937. In support of this contention it cites and relies

---

shall be made (for additional adjustments in case of certain reorganizations, see section 742 (e)) :

*     *     *     *     *     *

(J) ABNORMAL DEDUCTIONS.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

*     *     *     *     *     *     *

upon *Green Bay Lumber Co.*, 3 T. C. 824, wherein this Court held that all bad debts do not fall into a single class, that two different kinds of bad debts might be put into separate classes, and that a bad debt resulting from loans made to the principal employees of a corporation to enable them to purchase capital stock in another corporation was of a different class from other bad debts which were claimed and allowed. The cited case is distinguishable upon its facts from the instant proceeding. There the amounts allowed as bad debt deductions in other years did not include any bad debts with respect to money loaned to employees. Here the petitioner has been allowed as deductions for property taxes in other years the amount of taxes levied against its property by various school districts for school purposes. It is true that the tax here involved was a special or additional tax levied by the city of Hartford in connection with a consolidation of school districts, but this does not justify placing it in a separate class. Our conclusion is that the special school tax for 1937 does not constitute a deduction of a class abnormal for petitioner.

As an alternative contention, the petitioner urges that if the special school tax is determined to be not of a class abnormal for it under subparagraph (J) (i) of section 711 (b) (1), then a deduction for property taxes should be disallowed under the provisions of subparagraph (J) (ii) of section 711 (b) (1) as limited by subparagraph (K) (iii) of the same section. Subparagraph (J) (ii) provides that if the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess. Subparagraph (K) (iii) provides that the amount of deductions of any class to be disallowed under subparagraph (J) (ii) with respect to any taxable year shall not exceed the amount by which the deductions of such class for such taxable year exceed the deductions of such class for the taxable year for which the tax is being computed.

Petitioner concedes that because of the limitation provisions of subparagraph (K) (iii) it is not entitled to any disallowance in the computation of its base period net income for the calendar year 1941, inasmuch as its property taxes for that year exceeded deductions of this class of taxes for 1937.

Petitioner contends that either the amount of $6,311.57 or $5,623 should be disallowed as an abnormal deduction in the computation of its average base period net income for the calendar year 1940. The amount of $6,311.57 is based upon a computation which assumes that property taxes imposed by the city of Hartford comprise a separate class of deductions in and of themselves. The claim for the disallowance of this amount is not stressed by petitioner on brief and may be

dismissed without extended discussion. Suffice to say that no sound reason has been advanced for treating the property taxes imposed by the city of Hartford as a separate class of deductions, and we know of none. Obviously, they are in the same class with other property taxes levied against petitioner's property by other cities and counties.

We have set forth in the margin the computation advanced in support of petitioner's claim for the disallowance as an abnormal deduction of property taxes in the amount of $5,623.[6]

Section 711 (b) (1) (K) (ii) provides that deductions of the kind contended for by the petitioner shall not be disallowed unless the taxpayer establishes that "the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer." Respondent urges that petitioner has failed completely to sustain the burden of establishing these negative requirements, and that, in fact, the increase in property taxes for the base period year 1937 is due wholly to the change in the size of the petitioner's business, particularly the increase in the size of its property holdings in the city of Hartford, and may therefore in no event be disallowed under the provisions of subparagraph (K) (ii). Respondent points out that the assessed value of property of petitioner in the city of Hartford, for property tax purposes, was $2,088,176 for 1936 and $2,459,796 for 1937, a total increase of $371,620; that this increase was due to additions to petitioner's existing building and other property in the city of Hartford necessitated by an increase in the size of petitioner's business; that this increase of $371,621 at the

[6] Computation under subparagraph (J) (ii):

| Calendar year | City of Hartford | Cities and counties of other states | Total |
|---|---|---|---|
| 1933 | $52,037.85 | $1,151.29 | $53,189.14 |
| 1934 | 53,024.31 | 945.16 | 53,969.47 |
| 1935 | 52,747.12 | 1,229.19 | 53,976.31 |
| 1936 | 54,639.21 | 976.13 | 55,615.34 |
| 1937 | *78,544.03 | 1,223.64 | 79,767.67 |
| Total, 1933–36 (4 years) | | | $216,750.26 |
| Four year average | | | 54,187.56 |
| 125% four prior years average | | | 67,734.45 |
| Actual base year deduction | | | $79,767.67 |
| 125% four prior years average | | | 67,734.45 |
| Excess amount | | | $12,033.22 |

Computation under subparagraph (K) (iii):
Actual base year deduction _____ $79,767.67
1940 property taxes _____ 74,144.67
$5,623.00

*Includes special assessment of school tax in the amount of $7,314.49.

1937 tax rate of 29.25 mills would result in property taxes in the amount of $10,869.88; and that, inasmuch as the existing property tax rate applied to the increase in size, $10,869.88, is almost twice as large as the excess abnormality of $5,623, the latter should not be disallowed.

Petitioner contends that, inasmuch as the amount of the increase attributable to the increase in tax rate is in excess of $5,623, the latter amount should be disallowed as a deduction.

The increase in petitioner's city of Hartford property taxes from $54,639.21 for 1936 to $71,229.54 for 1937, or $16,590.33, was due to two factors, (1) an increase in the rate of tax from 26.70 mills to 29.25 mills, and (2) an increase in assessed value of property due to additions. The following computation shows that $6,209.75 of the increase in 1937 taxes was attributable to the increase in the tax rate and $10,380.55 to the increase in assessed value of property resulting from an increase in the size of petitioner's business:

| | | |
|---|---:|---:|
| Total taxes on property for 1937 (see footnote 6) | | $79, 767. 67 |
| Total assessed value for 1937 | $2, 459, 796. 00 | |
| City of Hartford general property tax computed at rate for 1934–1936 (26.70 mills) | 65, 676. 55 | |
| Add: | | |
|     Special school tax | 7, 314. 49 | |
|     Property taxes levied by other cities and counties of U. S | 1, 223. 64 | |
| | 74, 214. 68 | |
| Deduct discount (1% of $65,676.55) | 656. 76 | 73, 557. 92 |
| Increase in 1937 taxes due to increase in tax rate | | 6, 209. 75 |
| Increase in 1937 taxes due to increase in assessed value of property | | 10, 380. 55 |
|     Total increase in 1937 taxes over 1936 taxes | | 16, 590. 30 |

The contention of the respondent that petitioner is not entitled to any disallowance because that portion of the increase in taxes due to increase in assessed value of property, $10,380.55, exceeds $5,623, and the contention of the petitioner that it is entitled to the disallowance of the entire $5,623 because that part of the increase due to increase in tax rate, $6,209.75, exceeds $5,623, are both based upon an erroneous application of the statutory provisions. Subparagraph (K) (ii) provides that deductions shall not be disallowed unless the taxpayer establishes that the "abnormality or excess" is not the consequence of several factors specified therein, the one here involved being an increase in the size of the taxpayer's business. The "abnormality or excess" with which we are here concerned is that computed under subparagraph (J) (ii) and amounts to $12,033.22 (see footnote 6), and does not refer to the limitation on the deduction of $5,623, computed in accordance with the provisions of subparagraph (K) (iii). The petitioner

has established that a portion of the "abnormality or excess" was the consequence of a factor not specified in subparagraph (K) (ii), viz., an increase in the property tax rate. It is therefore entitled to some disallowance of its property tax deduction for 1937 in computing its base period net income for the calendar year 1940. The amount to be disallowed is 6,209.75/16,590.30 of $12,033.22, or $4,504.03, which amount is not in excess of the limitation of $5,623 computed under the provisions of subparagraph (K) (iii).

In its amended petition, the petitioner alleges that the respondent erred in failing to disallow as an abnormal deduction under section 711 property taxes for 1938 in the amount of $2,101.92. This issue is not discussed by petitioner on brief, and it appears to have been abandoned. It may not be amiss to point out, however, that its property taxes for 1938 assessed by the city of Hartford amounted to $74,334.38 and by other cities and towns in the United States, $1,357.48, or a total of $75,691.86. 125 per centum of its property taxes for the four previous taxable years is $76,040.25. It is quite apparent, therefore, that its property taxes for 1938 do not exceed 125 per centum of these taxes for the four previous years, and that there was no abnormality in amount.

### Issue No. 5.

#### FINDINGS OF FACT.

During the taxable years 1933 to 1941, inclusive, the petitioner maintained on its books an account entitled "Miscellaneous Expense" having a subclassification entitled "Salaries Paid in Excess of Employment Period." In its tax returns "Salaries Paid in Excess of Employment Period" were combined with salaries paid to administrative employees, the total being reported in the tax returns in one amount under "Other Deductions" as administrative salaries.

The charges to said miscellaneous expense account in respect of salaries paid in excess of employment period for the calendar years, 1933 to 1941, inclusive, were as shown below:

| Calendar year | Total | Pensions | Payments to widows | Sickness pay | Severance allowance |
|---|---|---|---|---|---|
| 1933 | $6,749.18 | $4,800.00 | $167.06 | | $1,782.12 |
| 1934 | 5,935.11 | 4,500.00 | | $888.86 | 546.25 |
| 1935 | 5,458.01 | 5,000.00 | | | 458.01 |
| 1936 | 8,751.70 | 8,055.80 | | | 695.90 |
| 1937 | 15,361.56 | 7,590.00 | 6,377.04 | 584.67 | 809.85 |
| 1938 | 6,162.99 | 4,175.00 | | 1,334.83 | 653.16 |
| 1939 | 5,266.00 | 5,050.00 | | | 216.00 |
| 1940 | 6,696.80 | 5,300.00 | 1,221.96 | | 174.85 |
| 1941 | 4,539.61 | 3,062.50 | 605.57 | 268.66 | 602.88 |

During the years 1933 to 1941, inclusive, only five employees received the amounts shown under the heading of "Pensions" in the

preceding paragraph. The positions held by these employees prior to their retirement were officer-assistant manager, branch manager, engineer, and salesman.

The payments charged to the subaccount "Salaries Paid in Excess of Employment Period" were made pursuant to a policy in effect since the incorporation of the petitioner. The policy as to pensions was to continue the payment of compensation at a reduced rate to officers and employees after they were incapable of working and until they died. The policy as to payments to widows was to make payments to widows of deceased employees to assist them in the period immediately following death. The policy as to sickness pay was to make payments to worthy employees for periods longer than the general allowance for illness. The policy as to severance allowance was to pay a few extra weeks' pay to worthy employees at the time they were dismissed or left the employ of the petitioner. No payments were made until they were authorized and approved by officials of the company.

The policy as to pension payments was continued to January 1, 1944, when a formal pension plan was adopted covering all employees and certain officers receiving annual compensation in excess of $3,000, who constitute approximately 7½ per cent of the petitioner's employees.

Petitioner's gross income for the years 1933 to 1941, inclusive, was as follows:

| | | | |
|---|---|---|---|
| 1941 | $5,437,134.61 | 1936 | $2,665,464.69 |
| 1940 | 3,453,761.24 | 1935 | 2,095,200.60 |
| 1939 | 2,805,961.07 | 1934 | 1,534,950.78 |
| 1938 | 2,024,957.69 | 1933 | 1,333,001.39 |
| 1937 | 3,102,010.40 | | |

$6,957.18 of the 1937 expenditures charged to "Salaries Paid in Excess of Employment Period" is an abnormal deduction under section 711 (b) (1) (J) (ii), as limited by (K) (iii).

This abnormality is not a consequence of an increase in the gross income of the petitioner in its base period, a decrease in the amount of some other deduction in its base period, or a change at any time in the type, manner of operation, size, or condition of the business engaged in by the petitioner.

OPINION.

The petitioner contends that the excess of "Salaries Paid in Excess of Employment Period" for the calendar year 1937 over 125 per cent of the average for the four previous taxable years, viz., $6,957.18, should be disallowed as an abnormal deduction in computing its excess profits tax credit for the years 1940 and 1941.

The evidence discloses that for the calendar year 1937 the petitioner paid "Salaries in Excess of Employment Period" in the amount of

$15,361.56, as compared with $8,404.38, representing 125 per cent of the average for the four previous taxable years. Thus the deduction for 1937 exceeded 125 per cent of the average for the four previous taxable years by $6,957.18, and it exceeded the deduction for each of the calendar years 1940 and 1941 by more than $6,957.18.

The pertinent provisions of the statute, subparagraphs (J) (ii) and (K) of section 711 (b) (1), have been set forth in our opinion on issues 3 and 4, and need not be repeated.

The respondent contends that the claimed disallowance should not be made. He urges that the deductions in question were not of a class "normal" for petitioner; that prior to 1944 pensions were merely allotted in a hit or miss fashion where the directors or officers of the petitioner decided to grant them; that during the entire period in question only 5 administrative employees were selected to receive pensions, as contrasted with 150 employees who participated in the plan begun on January 1, 1944; that the pensions, payments to widows, sickness pay, and severance allowances were not paid according to any fixed plan, but according to the whim and determination of the officers of petitioner, and that they did not constitute a class that could possibly be reasonable in a business of the type conducted by petitioner. He also urges that it has been the petitioner's business experience and accounting practice to group this particular miscellaneous account as a part of administrative salaries; that it was so reported in its returns in each year; and, that if the class of administrative salaries were used to make the two comparisons required by subparagraphs (J) (ii) and (K) (iii), the excess amount to be disallowed would be zero for each of the excess profits tax years here in question. He calls attention to the fact that the payments to widows in the amount of $6,377.04 were made in the year 1937 when the gross income of the petitioner had reached its highest peak since 1933, and urged that they were a consequence of an increase in the gross income of petitioner in its base period year 1937.

Many of the statements of the respondent concerning the expenditures in question find support in the evidence, but the fact that the expenditures were not made according to any fixed plan, were few in number, and were authorized by the directors and officers of the petitioner does not justify the respondent's conclusion that they do not constitute a class reasonable in a business of the type conducted by petitioner. It is a matter of common knowledge that many employers make payments to worthy employees and their widows similar to those here involved. The fact that an employer makes such payments voluntarily and that they are few in number does not detract from the reasonableness of such payments in its business. As far as petitioner's accounting practice is concerned, it appears that on its books it has con-

sistently included "Salaries Paid in Excess of Employment Period" as a subaccount under "Miscellaneous Expense," and only on its tax returns has it grouped such payments with administrative salaries. These payments did not cover services currently being rendered. They depended upon circumstances such as death, long illness, and separation from service, and they properly belong in a class separate and distinct from routine salaries. They were so treated by petitioner on its books by grouping them as it did.

We do not agree with respondent that the amount of payments to widows was influenced by the size of petitioner's gross income. Petitioner's assistant treasurer testified that "The policy was to make payments to widows immediately following the death of the deceased employee, to assist them in the immediate period following their death." The amount paid therefore depended upon the number of deaths in a particular year, rather than upon income, and in this connection it is quite significant that in 1940 and 1941, when petitioner's gross income exceeded its gross income for 1937, the payments to widows were much smaller than they were in 1937.

On the basis of the foregoing, we have found as facts that $6,957.18 of the amount of "Salaries Paid in Excess of Employment Period" is an abnormal deduction under section 711 (b) (1) (J) (ii), as limited by (K) (iii), and that this abnormality is not a consequence of any of the factors mentioned in subparagraph (K) (iii). Petitioner is entitled to the disallowance as a deduction of the amount of $6,957.18 in computing its excess profits credit for the years 1940 and 1941.

## *Issue No. 6.*

### FINDINGS OF FACT.

At the time of its incorporation on December 31, 1928, the petitioner issued $3,228,300 par value of 6½ per cent cumulative preferred stock having a par value of $100 per share and redeemable at $108 per share and accrued dividends and $2,000,000 par value of common stock. The petitioner has never issued any other or additional capital stock. The common stock of the par value of $2,000,000 has remained outstanding in the hands of the public from December 31, 1928, to date.

Section 5 of the agreement of consolidation or merger dated December 31, 1928, whereby the petitioner was incorporated, required the creation of a sinking fund for the redemption and retirement of preferred stock, as follows:

A sinking fund for the redemption and retirement of preferred stock by redemption or purchase shall be created out of the annual net profits of the corporation remaining after deducting therefrom all taxes assessed against it and any accrued and unpaid dividends on its preferred stock. For that purpose there shall be credited to an account, to be established by the corporation and to be called the

Preferred Stock Sinking Fund Account (provided that the corporation is not in arrears in payment of preferred stock dividends), within sixty (60) days after the close of each and every calendar year, beginning December 31, 1928, and annually thereafter, twenty percent (20%) of the net earnings of the company for the preceding year after deductions therefrom as aforesaid. Within ninety (90) days after the close of each calendar year the same shall be expended for the purchase and retirement of preferred stock outstanding, either by purchase in the open market, or, if the same cannot be so acquired for a sum not exceeding One Hundred Eight Dollars ($108) per share and accrued dividends, by exercising the right as above set forth to redeem said stock on the next succeeding dividend date.

\* \* \* \* \* \* \*

The corporation may purchase preferred stock either from itself (viz: the stock which may be acquired by it in the open market) or from any other stockholder, and such purchases made at any time may be credited to the quota or quotas of stock to be redeemed and retired through the application of the preferred stock sinking fund at the purchase price and dividends paid or accrued thereon when transferred to said sinking fund. Preferred stock purchased or redeemed through application of the sinking fund, however, shall be immediately retired and shall not thereafter be re-issued, nor shall any preferred stock be issued in substitution therefor.

Pursuant to the operations of said sinking fund the petitioner redeemed or purchased and retired shares of its preferred stock, leaving the following number of shares outstanding at the end of each of the calendar years 1929 to 1936, inclusive, and also at June 30, 1937. In addition thereto, the petitioner from time to time purchased out of earnings and placed in its treasury additional shares of its preferred stock, as shown by the following tabulation of the total number of shares of treasury stock at the end of each of the calendar years 1929 to 1936, inclusive:

| | Stock outstanding | Treasury stock | | Stock outstanding | Treasury stock |
|---|---|---|---|---|---|
| | *Shares* | *Shares* | | *Shares* | *Shares* |
| 12/31/28 | 32, 283 | None | 12/31/33 | 21, 083 | 4, 877 |
| 12/31/29 | 29, 783 | 10, 284 | 12/31/34 | 21, 083 | 5, 048 |
| 12/31/30 | 27, 283 | 8, 411 | 12/31/35 | 15, 439 | 4, 781 |
| 12/31/31 | 26, 523 | 8, 448 | 12/31/36 | 13, 688 | 3, 703 |
| 12/31/32 | 21, 083 | 3, 689 | 6/30/37 | 9, 985 | None |

On July 1, 1937, petitioner issued to an insurance company its 4 per cent 10-year unsecured serial note in the principal amount of $1,000,000, payable in annual installments of not less than $50,000 commencing July 1, 1938.

Petitioner used the proceeds of the $1,000,000 note to retire all of its preferred stock outstanding in the par amount of $998,500, which was called for redemption on July 1, 1937, at $108 per share and accrued dividends.

The principal amount owed by petitioner on the $1,000,000 note at the end of each of the calendar years 1937 to 1942, inclusive, was as follows:

| 1937 | $1,000,000 | 1940 | $700,000 |
| 1938 | 950,000 | 1941 | 200,000 |
| 1939 | 850,000 | 1942 | ------- |

The reductions in the principal amount owed by petitioner on the $1,000,000 note, as set forth in the preceding paragraph, were effected through the use of surplus funds in petitioner's treasury constituting undistributed earnings and profits.

The interest deductible by petitioner on the $1,000,000 note and the total of all other interest deductible by it for each of the calendar years 1933 to 1941, inclusive, were as follows:

| Year | Interest on $1,000,000 note | Total other interest | Year | Interest on $1,000,000 note | Total other interest |
| --- | --- | --- | --- | --- | --- |
| 1933 | | | 1938 | $39,000 | $2,230.84 |
| 1934 | | $996.64 | 1939 | 37,000 | 673.60 |
| 1935 | | 160.02 | 1940 | 31,000 | 1,314.09 |
| 1936 | | 3,475.19 | 1941 | 18,000 | 4,097.29 |
| 1937 | $20,000 | 7,763.23 | | | |

Other than the above mentioned loan of $1,000,000, the petitioner never at any time incurred loans for the purchase or redemption of its preferred stock.

Since incorporation of the petitioner there have been no changes in the kind of business conducted by it, which consists of the manufacture of electrical wiring devices and the sale of such devices throughout the United States through the petitioner's own salesmen under the supervision of branch managers. The petitioner's business cycle follows that of the electrical industry in general. The only changes that have occurred in the petitioner's manufacturing processes are the normal, routine changes made by the industry to increase efficiency and reduce labor costs.

Petitioner's interest deductions for the years 1937, 1938, and 1939 were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years. The abnormality was not a consequence of an increase in the gross income of the petitioner in these three base period years, a decrease in the amount of some other deduction in these years, or a change at any time in the type, manner of operation, size, or condition of the business engaged in by the petitioner.

OPINION.

The petitioner contends that in the computation of its average base period net income the excess of the interest paid for the calendar years

1937, 1938, and 1939 on the $1,000,000 note issued on July 1, 1937, or in the alternative, the excess of the total interest paid on all indebtedness for the calendar years 1937, 1938, and 1939 over 125 per cent of the average for the four previous taxable years should be disallowed as abnormal deductions.

Petitioner's principal contention is based upon the provisions of subparagraph (J) (i) of section 711 (b) (1), and its alternative contention upon the provisions of subparagraph (J) (ii) of the same section.

Respondent contends, and we agree, that the interest paid on the $1,000,000 loan is not abnormal within the meaning of subparagraph (J) (i), covering deductions abnormal as to class. The fact that the interest in question resulted from a business loan made to purchase preferred stock and other interest resulted from business loans made in connection with current operations does not justify treatment of the former as a class abnormal for petitioner. The purposes for which business loans are made may be and usually are different, but the interest paid on one of these loans does not differ in class from interest paid on another.

Respondent apparently agrees that the interest deductible by petitioner for the years 1937, 1938, and 1939, including the interest on the $1,000,000 loan, was abnormal in amount within the meaning of subparagraph (J) (ii), as limited by (K) (iii). He urges that no deduction should be disallowed, however, because petitioner had not established that the abnormality or excess is not a consequence of an increase in its gross income in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by it, as required by the provisions of subparagraph (K) (ii).

The petitioner has introduced evidence in regard to the abnormality, the substance of which is set forth in our findings, to show that the abnormality was not a consequence of any of the factors mentioned in subparagraph (K) (ii), and has made out a prima facie case. The respondent has not overcome that showing. He urges that the abnormality or excess should not be disallowed because it was a consequence of a change in the condition of the business engaged in by petitioner during the period in question; that the terms "change * * * in the condition of the business" as used in subparagraph (K) (ii) and "change in the character of the business" as used in section 722 are so similar that they may well be interchangeable, and that the latter term is specifically defined in section 722 to include "a difference in the ratio of nonborrowed capital to total capital." Respondent then points to the amount of preferred and common stock of petitioner

prior to July 1, 1937; the change in its capital structure resulting from the $1,000,000 loan and the purchase of outstanding preferred stock; and the subsequent liquidation of the loan, and he concludes that the condition of the petitioner's business, in so far as its finances were concerned, had changed from an invested capital basis to a combined invested and borrowed capital basis and finally to a substantially reduced invested capital basis.

We do not agree with the respondent. The terms "change * * * in the condition of the business engaged in by the taxpayer" in subparagraph (K) (ii) and "change in the character of the business" in section 722, are neither synonymous nor interchangeable, and the definition of the latter term in section 722 does not apply to the former. Moreover, even if it be assumed that the change in petitioner's capital structure which was effected by the use of the proceeds of the loan to purchase outstanding preferred stock could be construed to be a change in the condition of the business engaged in by petitioner, the abnormal amount of interest deducted in 1937, 1938, and 1939 was not a consequence of the change. The interest deductions were the consequence of the issuance of the $1,000,000 note obligating petitioner to pay interest. The change in petitioner's capital structure was a consequence of the application of the proceeds of the loan to the purchase of the outstanding preferred stock.

The petitioner having established to our satisfaction that the interest deductions for the calendar years 1937, 1938, and 1939 were not a consequence of any of the factors mentioned in subparagraph (K) (ii), and that they were abnormal in amount within the meaning of subparagraph (J) (ii), as limited by subparagraph (K) (iii), we hold that the following amounts should be disallowed as deductions in the base period years in computing petitioner's excess profits tax credit for the years 1940 and 1941:

|  | Calendar year 1940 | Calendar year 1941 |
|---|---|---|
| 1937 | | $5,665.94 |
| 1938 | $8,916.78 | 19,133.55 |
| 1939 | 5,359.54 | 14,976.95 |

Reviewed by the Court.

*Decision will be entered under Rule 50.*

MURDOCK, *J.*, dissenting: The first issue arises under section 721 (a) (2) (F), which deals with dividends of a foreign corporation but does not define "dividends." Section 115 (a) and (b) provides that a dividend is from the most recently accumulated earnings to the

extent of the earnings of the year of declaration computed as of the end of that year, regardless of the earnings of that year up to the date of the declaration. That is a part of the definition of a dividend for the purposes of chapter I and has been the law since 1936. Congress, in imposing the excess profits tax in 1939, provided in section 729 that the provisions of chapter I were to apply in respect of the excess profits tax except where they were inconsistent with the new provisions of subchapter E. Thus, section 115 was made applicable under 721 if it was not inconsistent with 721. Section 721 (b) provides that net abnormal income is to be attributed to previous years under regulations prescribed by the Commissioner. The Commissioner specifically dealt with the allocation of dividends of a foreign corporation in section 30.721–11 of Regulations 109. He there provided that "The earnings and profits out of which any distribution is made [by a foreign corporation] are, as provided in section 115, the most recently accumulated earnings and profits." This means that section 115 must be followed in determining the source of any dividend by a foreign corporation. Its effect, as stated above, is that any dividend by a foreign corporation is from earnings of the year of declaration to the extent of such earnings at the end of that year rather than at the date of declaration. That rule can work for as well as against taxpayers. It is arbitrary in a sense, but has reason too. It is in nowise inconsistent with any provision of subchapter E. Thus, the Commissioner made a valid regulation and followed it in this case. We make a great mistake in this early case under section 721 by invalidating his regulation.

I think we make a further mistake in holding on the last issue that all interest on business loans is of the same class regardless of the nature or purpose of the borrowing. Nor is it any answer to say that there is no abnormality of class because some relief comes due to abnormality in amount. Interest on this loan to retire preferred stock was so different from all other interest paid by this taxpayer as to require its disallowance in toto in determining normal earnings of those base period years. The prevailing opinion thwarts the obvious purpose of the relief provision.

DISNEY, HARRON, and OPPER, *JJ.*, agree with this dissent.

---

TURNER, *J.*, dissenting: On the first issue I agree with the dissent of Judge Murdock. As to the last issue, I agree that for the purpose of applying section 711 (b) (1) (J) (i) all interest is not necessarily of the same class, regardless of the nature or purpose of the borrowings. I would have difficulty here, however, in concluding that the nature and purpose of the borrowings justify the conclusion that the interest paid on the $1,000,000 note is abnormal as to class.