THE FRANK SHEPARD COMPANY, PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 8904.    Promulgated November 6, 1947.

*Norris Darrell, Esq.*, and *Alexander J. Bruen, Esq.*, for the peti-
tioner.

*Martin M. Lore, Esq.*, for the respondent.

914

918

### OPINION.

BLACK, *Judge*: We shall consider together the four issues set out in our preliminary statement. They are so closely connected that they can be treated together. The applicable statute [1] and regulations [2] are set forth in the margin.

---

[1] SEC. 711 [I. R. C.]. EXCESS PROFITS NET INCOME.

\* \* \* \* \* \* \*

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made \* \* \*

\* \* \* \* \* \* \*

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

Our first problem is to determine to what extent the deductions in 1938 and 1939 for premiums and pensions come within the term "class" as that term is used in the applicable statute. The determination of that issue is considerably clarified by our recent holding on issue No. 5 in *Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350, 1372. There we held that deductions for pensions, payments to widows, sickness pay, and severance allowance, all together constituted one single "class" separate and distinct from routine salaries or any other

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J)—

\* \* \* \* \* \* \*

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

(iii) The amount of deductions of any class to be disallowed under such subparagraphs with respect to any taxable year shall not exceed the amount by which the deductions of such class for such taxable year exceed the deductions of such class for the taxable year for which the tax under this subchapter is being computed.

[2] Sec. 35.711 (b)-2 [Regulations 112]. Abnormal Deductions in Base Period.—Adjustments in the excess profits net income for a taxable year in the base period are required in order to disallow deductions of a class which is abnormal for the taxpayer, and to disallow the amount by which deductions of a class normal for the taxpayer exceed 125 percent of the average amount of deductions of such class for the four previous taxable years. \* \* \*

A class of deductions is abnormal only if the taxpayer had no deductions of that class in the taxable years prescribed for determining average deductions.

The taxpayer must establish that the abnormality or. excessiveness of the deduction is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer. \* \* \*

In order for the deduction of any class to be disallowed, the deductions of such class for the taxable year in the base period must exceed the deductions of the same class for the taxable year for which the excess profits tax is being computed, and any amount which may be disallowed shall be no greater than the amount by which the deductions of such class for the base period taxable year exceed the deductions of the same class for the taxable year for which the excess profits tax is being computed. \* \* \*

(a) *Classification of deductions.*—Section 711 (b) (1) (H) and (I) sets forth specific classes of deductions, the amount of which in any base period taxable year may be totally disallowed if abnormal for the taxpayer or disallowed to the extent of the excess over 125 percent of the average of such class if normal for the taxpayer. Section 711 (b) (1) (J) permits the classification of other deductions in accordance with these regulations. In any case, the amount of deductions of any class which may be disallowed shall be determined in the manner previously set forth in this section.

\* \* \* \* \* \* \*

Deductions which do not fall within either of the classes specified in section 711 (b) (1) (H) and (I) may be grouped by the taxpayer, subject to approval by the Commissioner on the examination of the taxpayer's return, in such other classes as are reasonable in a business of the type which the taxpayer conducts, and are appropriate in the light of the taxpayer's business experience and accounting practice. \* \* \*

(b) *Statement required.*—If in computing its excess profits net income for a taxable year in the base period, the taxpayer claims the disallowance under section 711 (b) (1) (H), (I), or (J) of any amount previously allowed as a deduction, there shall be submitted a full statement showing the computation of the amount to be disallowed, the prices and gross sales of the taxpayer's product, and the condition of the taxpayer's business which demonstrate that the disallowed amount is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer \* \* \*

class of deductions. In the instant proceeding petitioner on its books and in its returns treated the expenditures for both premiums and pensions as one single class under the heading of "Pension Roll" account. In the deficiency notice the respondent separated the two, but has made no particular point about it. Petitioner is not so much concerned with whether the expenditures for premiums and pensions be considered as one single class or as two separate classes, although it does favor considering them as two separate classes. Its main contention on this point is that neither expenditure be grouped with some other class of deduction, and on this main contention it is our opinion and holding that petitioner is correct. *Arrow-Hart & Hegeman Electric Co., supra.* It is also our opinion and holding that the expenditures for both premiums and pensions constitute one single "class" of deductions as that term is used in the statute. The objective of both expenditures was substantially the same, and we know of no reason why they should not be grouped into one class for the purpose at hand. Cf. *Truax* v. *Corrigan,* 257 U. S. 312, cited in *Green Bay Lumber Co.,* 3 T. C. 824, 829.

Our next problem is to determine whether under section 711 (b) (1) (J) (i), the "deductions of such class" namely, the deductions for both premiums and pensions considered together as one class, were "abnormal" for petitioner, in both 1938 and 1939, two of petitioner's base period years.

*Year 1938.*

We first take up and decide the issue as to the year 1938.

Webster's New International Dictionary, 2d Ed. Unabridged, defines abnormal as "Deviating from the normal condition; not corresponding to the type; markedly or strangely irregular." That definition was accepted and applied as a proper test of abnormality in *R. C. Harvey Co.,* 5 T. C. 431, and in *City Auto Stamping Co.,* 7 T. C. 354. Since petitioner had been in business for more than 35 years prior to 1938 and was conducting essentially the same business without ever having made any expenditure of the class which it made in 1938 for pensions and the purchase of annuity policies, it seems self-evident that such expenditures which were allowed as deductions in 1938 were abnormal for petitioner in 1938. They represented a deviation from the type of expenditure ordinary or usual for petitioner. Cf. *Green Bay Lumber Co., supra.* But even if we were wrong in holding that these deductions were abnormal for petitioner in 1938, the result would be the same. As far as the deductions for 1938 are concerned, it would make no difference whether they were abnormal or normal. If abnormal, the 1938 deductions would not be allowed under section 711 (b) (1) (J) (i), and, if normal, they would be disallowed under section 711 (b) (1) (J) (ii) for the reason that petitioner had no

deductions of such class for the four taxable years previous to 1938 and the total deductions for 1938 would therefore also be the "amount equal to such excess" provided for in the statute.

### Year 1939.

But we can not sustain petitioner's contention that its expenditures in 1939 for annuity premiums and pensions were abnormal to it within the meaning of section 711 (b) (1) (J) (i). Petitioner's contention with respect to 1939 in substance is: That the year 1939 was only the second year in the petitioner's history of more than 35 years in which it purchased retirement annuities for any of its employees; that in 1939 the petitioner still had no formulated plan or policy with respect to the superannuation of employees; and that the same circumstances which rendered abnormal the expenditures made in 1938 in the purchase of annuity policies and the payment of pensions rendered also abnormal similar expenditures made in 1939.

It seems clear to us, however, upon the whole record that in 1938 petitioner definitely decided to enter upon a course of conduct of providing annuities and pensions for its superannuated employees and, therefore, in years subsequent thereto when this class of expenditures was continued such expenditures became normal. The following facts in the record, among others, convince us that this course of conduct was entered upon in 1938 by petitioner. In 1939 petitioner expended $15,237.53 in the purchase of such annuities and $2,132 in the payment of pensions. In 1940 petitioner purchased single premium annuities for employees at a cost of $22,800.73 and paid pensions of $2,132. In 1941 petitioner expended $30,235.74 in the purchase of annuity policies and $2,214 in pensions. In 1942 petitioner did not purchase any annuity policies but expended $1,493 in pensions. It seems clear from the record that the reason petitioner did not purchase any annuity policies in 1942 was on account of the 1942 Revenue Act, which provided for new pension plans, and petitioner began at once to formulate such a plan for its employees, which was perfected in 1943 and was approved by the Commissioner of Internal Revenue October 21, 1944. Therefore, we hold that, petitioner having set out on a course of conduct in 1938 of providing annuities and pensions to its superannuated employees and having expended in that year $52,344.46 for that purpose, such expenditures, although abnormal for 1938, when continued for 1939 and subsequent years can not be classed as abnormal for those years under the provisions of section 711 (b) (1) (J) (i). We hold that such expenditures for 1939 should be disallowed only to the extent that they fall within the provisions of section 711 (b) (1) (J) (ii). Cf. *Arrow-Hart & Hegeman Electric Co., supra.*

In arguing that these expenditures for 1939 should be disallowed as abnormal on the same basis as those for 1938, petitioner strongly relies on *City Auto Stamping Co.*, *supra.* We think the instant case is clearly distinguishable from that case on its facts. In the *City Auto Stamping Co.* case, the taxpayer, a manufacturing corporation, in 1933 paid approximately $300,000 on judgments in suits brought by the superintendent of banks alleging unlawful preference in withdrawal of deposits. In 1937 it paid approximately $70,000 in settlement of a suit brought against it involving a dispute over a contract as to patent rights, also in settlement of a suit brought by stockholders, alleging mismanagement in connection with the patent rights and the litigation growing therefrom. Under these facts we held that the $70,000 expended in 1937 in the settlement of the judgment claims in that year was abnormal within the meaning of section 711 (b) (1) (J) (i), and that this abnormality was not destroyed by the fact that the taxpayer back in 1933 had paid a judgment of $300,000 which was wholly unrelated to the judgments paid in 1937. In thus holding we said: "Logic forbids a conclusion that the fact that there are two abnormalities causes both to become normal." Manifestly, we have no such facts here and the case of *City Auto Stamping Co.* is not controlling. We overrule petitioner on this point.

Under the limitation provided for in subparagraph (K) (iii) of section 711 (b) (1), the deductions of the class for 1938 of $52,344.46 must be reduced by the deduction of the class for 1942 of $1,493.

Subparagraph (K) (ii) of section 711 (b) (1) provides that for the purposes of subparagraphs (H), (I), and (J) of section 711 (b) (1):

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

We have found as an ultimate fact that petitioner has established that the abnormality and excess here are not a consequence of any of the factors mentioned in subparagraph (K) (ii). Although petitioner experienced an increase in gross income in its base period, notably in the year 1938, it has established to our satisfaction that the expenditures which it made in 1938 and 1939 for the premiums and pensions here in question, and the abnormality and excess of such expenditures, were not a consequence of such increase in its gross income. It has shown that these expenditures and the increase in the gross income were totally unrelated. Petitioner has convinced us that it would have purchased the annuity policies and

paid the pensions regardless of whether its gross income increased or not. Petitioner had ample funds to make these expenditures without the increase which it had in its gross income. The making of these expenditures was purely a voluntary action on the part of petitioner's board of directors. There was no agreement or understanding with any of the employees or with anyone else requiring petitioner to purchase the annuity policies or pay the pensions in the event of an increase in its gross income or in any other event. Petitioner has also shown that the abnormality and excess in question were not the consequence of a decrease in the amount of some other deduction in its base period. When the policies were delivered to the respective beneficiaries they were told that the receipt of such policies would have no effect on their future salaries one way or the other and that the purchase of such policies was purely a voluntary action on the part of petitioner. During the four years prior to 1938 petitioner's deductions actually increased rather than decreased. They also increased during the years 1938 and 1939 without taking into consideration the amounts deducted for the premiums and pensions here involved. There has been no change in the type, manner of operation, size, or condition of the business engaged in by petitioner for a number of years. Petitioner has compiled and published citations since its incorporation in 1900, and there has not been any change other than the normal growth which might take place in the period of a decade. We are satisfied from the evidence that petitioner has established that the abnormality and excess here in question were not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by petitioner. We think that petitioner has successfully shown that the abnormality and excess here in question were the direct consequence of petitioner's board of directors' voluntary decision made under a sense of social responsibility to do something towards providing for the superannuation of its older employees, and that such abnormality and excess were not the consequence of any of the factors mentioned in subparagraph (K) (ii). We hold, therefore, that petitioner's excess profits net income for 1938 and 1939 as determined by the respondent should be adjusted in accordance with this opinion. Petitioner's excess profits credit will be determined accordingly.

The above holding will automatically require an adjustment in petitioner's unused excess profits credit carry-over to the year 1942 from the years 1940 and 1941, which adjustment will be made under Rule 50.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

Disney, *J.*, dissenting: The majority opinion concludes, rightly I think, that the deductions for pensions and annuities, not having occurred through petitioner's 35 years of previous existence, were abnormal in class for 1938; nevertheless, concludes that for 1939 they were normal. In substance, the reason given for the holding of normality in 1939 is that they were instituted as a course of conduct in 1938, and continued throughout 1939 to 1942, inclusive. In my view such reason contravenes the essential basis for the excess profits tax and its ascertainment. The prime object of the various sections of the statute is to ascertain and tax excess profits. Ascertainment as to how much is excess involves, of course, a comparison. That comparison is with the average income from a 4-year period called the base period. In order to arrive fairly at the amount of excess, a fair average for the base period income must be arrived at. This is done by first computing "the excess profits net income" for each of the base period years, and then applying certain other sections to get at the average. To prevent unfairness, abnormalities are avoided by the use so far as here pertinent, of the provisions of section 711 (b) (1) (J) (i), which provides for adjustment of the "excess profits net income" for each base period year by disallowance of deductions which are abnormal in class. The excess profit is computed after giving "excess profits credit" for 95 per cent of the average base period net income as finally ascertained, including the use of section 711 (b) (1) (J) (i) above. The end and object of the statute is the determination of the average base period net income, the credit, and the tax on the excess profit. The taxable year here is 1942; the base period years are 1936 to 1939, inclusive.

I can not bring myself to believe that normality of deductions for 1939 can, under the objectives and mechanics of the excess profits law be found by examining years later than 1939—the last base period year. Later years do not comprise the period with which essentially the profits for 1942 are compared; and of course 1942 can not be compared with itself, which is, in effect, done by the majority opinion so far as 1939 normality is made to depend upon the deduction situation in 1942. In my opinion, whether deductions in 1939 were normal depends upon the history of previous years and can not be predicated upon examination of later nonbase period years. The matter, I think is to be viewed, not from later years, but from the base period (and perhaps earlier years). Otherwise, I see no comparison between 1942 and the base period, which is the basic idea in the whole statute, in order that any "excess" may be determined. Not only does it appear logically impossible to arrive at an "excess" of the taxable year over "the test period" (Regulations 112, sec. 35.711 (b)-2 (b)), but certain statutory provisions indicate to me that it was never Congressional

ntent to determine abnormality of a deduction in a base period year by considering whether it was normal in later years. First, in section 711 (b) (1) (J) (ii), as to abnormalities *in amount*, the comparison is with the four *previous* years; and in section 711 (b) (1) (K) (i), which is one of the "rules for application of subparagraphs (H), (I), and (J)," it is provided that if the taxpayer was not in existence for four previous years, the average to determine abnormality *in amount* may be ascertained by considering the previous years of existence *and* later years up to the "second taxable year under this subchapter"— which is 1941, since 1940 was the first year of the excess profits tax law. See Regulations 112, sec. 35.711 (b)-2. Thus, we see that in determining the average in amount, only previous years, in the usual situation, and only up to 1941 in the unusual situation of no previous four years, are to be regarded. Only in the absence of *previous* existence or experience, to the extent of four years, is any later time to be considered. The number of years is, in any event, to be no more than four. I think the same logic applies to determining normality in class, and that we may not determine normality in 1939 by normality in later years which do not enter into the test. Yet here, we see the majority covering five years, 1938–1942, inclusive, to determine normality, going into future years to use hindsight, and in particular using a period after 1941, the taxpayer's "second taxable year under this subchapter." In this connection, I note that Regulations 112, section 37.711 (b)-2 (b), providing for the statement required of taxpayers claiming disallowance of abnormal deductions under (H), (I), or (J), requires a showing for only *four preceding* years (or such years as the taxpayer is required to use in determining the average). Nothing requires or indicates that it may use later years, and, as above seen, it may not go beyond 1941, or beyond four years.

Consideration of section 722 (a) also indicates, in my opinion, that future years may not help determine abnormality; for thereunder a "fair and just amount representing normal earnings" may be "used as a constructive average base period net income for the purposes of an excess profits tax *based upon a comparison of normal earnings and earnings during an excess profits tax period*" (italics supplied), and "in lieu of the average base period net income otherwise determined under this subchapter"; but it is provided that, in determining such constructive average base period net income, "no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939," (with certain exceptions not pertinent here). I suggest that this language makes it completely clear that the excess profits tax is based on comparison, and that, with good reason, events or conditions (normality or abnormality) after the

"test period" are necessarily in logic not regarded. I can see no reason to distinguish in this respect between the actual and the constructive base period net income, and have no doubt that Congress intended none. Yet here, the majority determines normality of deductions in 1939 in part because of conditions in 1940–1942, inclusive. I think no sound base for an excess profits tax can be so determined.