UNIVERSAL OPTICAL COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9999. Promulgated October 14, 1948.

Richard F. Canning, Esq., for the petitioner.
M. L. Sears, Esq., for the respondent.

614

OPINION.

VAN FOSSAN, *Judge*: In 1936 old Universal paid, and it deducted in its 1936 income tax return, salaries and bonuses paid to its five officers aggregating $79,421.15. The petitioner claims that part of such amount should be disallowed in 1936 as abnormal under section 711 (b) (1) (J) (ii) of the Internal Revenue Code in computing the average base period net income for the purpose of determining its excess profits credit based on income under section 713 of the Internal Revenue Code.

From the evidence adduced, it is apparent that the class of deductions, i. e., officers' salaries and bonuses, was normal for the taxpayer and that the deduction of that class in 1936 was in excess of 125 per centum of the average amount of the deductions of such class for the four previous taxable years. Thus the excess of $30,915.33, under the mathematical formula provided in section 711 (b) (1) (J) (ii), is disallowable.

However, the respondent contends that petitioner has not established, as required by section 711 (b) (1) (K) (ii) of the Internal Revenue Code, that the 1936 deduction for salaries and bonuses was not a consequence of an increase in gross income for 1936, a base period year, or of a change in the manner of operation of the business engaged in by petitioner's component corporation, old Universal.

Section 711 (b), in so far as pertinent, is set forth in the margin.[1]

---

[1] SEC. 711. EXCESS PROFITS NET INCOME.

\* \* \* \* \* \* \*

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made (for additional adjustments in case of certain reorganizations, see section 742 (e)) :

\* \* \* \* \* \* \*

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

\* \* \* \* \* \* \*

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J)—

\* \* \* \* \* \* \*

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

(iii) The amount of deductions of any class to be disallowed under such subparagraphs with respect to any taxable year shall not exceed the amount by which the deductions of such class for such taxable year exceed the deductions of such class for the taxable year for which the tax under this subchapter is being computed.

It is argued by petitioner that, because of the practices indulged in by old Universal to evade payment of royalty to American, it, old Universal, was a "distinct thorn in the side of" American and Ful-Vue Sales Co.; that, when Kimmel of the latter company proposed to purchase the stock of old Universal as a means of settling the difficulties, the officers of old Universal were justified in concluding that their stock had a substantial nuisance value for which Kimmel and his associates would be willing to pay without reference to the true value of the stock or the assets of old Universal; and that the reason which prompted the payment of the bonuses of $41,000 voted in November 1936 was "the conviction of the management that cash could be distributed without adversely affecting the price of the stock."

It is true that the record indicates a regular and continuous practice of paying bonuses in "recognition of successful and skillful management," as argued by respondent, and that the amounts voted and paid as salary and bonuses in 1936 were deducted as such in the 1936 return of old Universal. However, Sweeney, the then president of old Universal and now of petitioner, testified that the salary and bonuses authorized in the early part of 1936 were for services rendered, "but those November bonuses were obviously a distribution of cash," and, again, that "the bonus distribution at that time was a distribution of cash in anticipation of selling the business at a price, regardless of the equity behind the price" and "regardless of what the minutes say, the minutes were a formula." Thus it appears that the portion of the 1936 deduction to the extent of $41,000 was not compensation paid in recognition of services rendered, but a disposition of cash or profits to the officers, all of whom were stockholders of old Universal. With the elimination of such distribution from the 1936 deduction, there is no abnormality in amount.

The respondent states on brief that he has not assumed and does not now assume the payments to have been other than for salaries, as stated in the minutes. He argues that the increased salaries were inextricably involved with the increased gross income and that there was some connection between the increased earnings and increased compensation. The facts show otherwise, as illustrated by the following schedule:

| Year | Gross income | Officers' compensation | Per cent of change in gross income from prior year | Per cent of change in officers' compensation from prior year |
|---|---|---|---|---|
| 1932 | $102,870.57 | $32,360.00 | | |
| 1933 | 139,165.05 | 37,640.88 | +35 | +16 |
| 1934 | 124,687.72 | 45,882.00 | −10 | +22 |
| 1935 | 172,481.55 | 39,335.58 | +38 | −14 |
| 1936 | 196,557.46 | 79,421.15 | +14 | +102 |
| 1937 | 121,669.14 | 30,585.71 | −38 | −61 |
| 1938 | 38,650.01 | 24,500.00 | −68 | −20 |
| 1939 | 142,546.24 | 24,040.71 | +269 | −2 |

Thus, although there was a decrease in gross income in 1934 of about 10 per cent, there was an increase in officers' compensation of about 22 per cent. In 1935, although there was an increase in gross income of about 38 per cent, there was a decrease in officers' compensation of about 14 per cent; and in 1936, although the increase in gross income was only about 14 per cent, the increase in officers' compensation was about 102 per cent.

In our opinion, the above schedule discloses no pattern of relationship between gross income and officers' compensation. The fact that there was an increase in gross income in 1936 is not sufficient by itself to establish that the deduction for officers' compensation was due to such increase. See *Frank Shepard Co.*, 9 T. C. 913, 926, and *O. Hommel Co.*, 8 T. C. 383, 387. *American Paper Specialty Mfg. Co.*, 9 T. C. 166, cited by respondent, is distinguishable on the facts. Therein it was shown that it was understood that, if the company there involved would earn any substantial profits, suitable adjustment of the salary of the vice president and plant superintendent would be made, and this was done in the year of the alleged abnormal deduction.

The petitioner, however, has not established that the payment of the additional bonuses authorized in November 1936 was not a consequence of a change in the manner of operation of the business engaged in by old Universal as required by section 711 (b) (1) (K) (ii). Prior to August 1936 old Universal was operating under a license agreement entered into with American covering patents owned by Ful-Vue Sales Co. After American instituted suit against old Universal for breach of the agreement, old Universal canceled the license agreement, which, as testified by Sweeney, "left us freedom to go out and combat them vigorously, realizing the weakness of their position from the standpoint of the validity of the patents." Shortly thereafter Kimmel, a member of the partnership of Ful-Vue Sales Co., contacted Sweeney in an attempt to purchase the stock of old Universal. This led to the decision of the officers, as testified by Sweeney, to "distribute some of the cash so long as the diminishing of the equities had no bearing on the purchase price." Thus there was a relationship of cause and consequence between the change in the manner of operation of the business and the authorization in November of the additional bonuses of $41,000. Even if the additional bonuses be regarded as, in fact, officers' compensation for services rendered by them, the excess of the 1936 deduction as computed under section 711 (b) (1) (J) (ii) may not be disallowed because of petitioner's failure to establish the negative, as required by section 711 (b) (1) (K) (ii) ; i. e., that the excess is not a consequence of a change at any time in the manner of operation of the business engaged in by the taxpayer.

The petitioner, therefore, is not entitled to the disallowance claimed.

In view of our conclusion, it is not necessary to consider respondent's further contention that petitioner has failed to prove essential facts with respect to the limitation on abnormality contained in section 711 (b) (1) (K) (iii).

The bad debts in 1939 of $29,896.38 included a write-off on the account of B. Robinson of $13,247.84 and a write-off on the notes receivable account of Max Zadek, Inc., of $15,000.

The account of Robinson was the largest account of old Universal. In 1939 a robbery occurred in Robinson's place of business. Robinson had cooperated with old Universal in some of the devices and practices resorted to by old Universal to evade payment of royalty to American, as a consequence of which his books did not reflect the correct amount of merchandise on hand prior to the robbery. As a result, Robinson was unable to recover on his insurance his entire loss sustained by the robbery. He took the position that his method of bookkeeping was due to the practices of old Universal and that it was responsible for his failure to recover his loss from the insurance company. Apparently, to placate its best customer, to obtain payment of the account, in part, at least, and to obtain future business, a compromise settlement was reached, which resulted in the write-off in 1939 on Robinson's account of $13,247.84. It was stipulated that Robinson at all times during 1939 was financially able to pay all his debts and obligations in full, including his account with old Universal.

Obviously, the credit to Robinson's account of $13,247.84, under the circumstances, was improperly classified as a bad debt.

It is conceded on brief by petitioner that the item was not a bad debt in the usual sense of an account which becomes worthless by reason of the inability of the debtor to pay. It contends, however, that it was an expense of operation of the business and that, if taken out of normal bad debts, it should be classified as a deduction of a class abnormal for the taxpayer under section 711 (b) (1) (J) (i), or as an abnormal deduction attributable to a claim within section 711 (b) (1) (H).

Such classification under either subsection is not permissible unless evidence is adduced showing that the deduction was of a class abnormal to the taxpayer; i. e., that there were no deductions of that class in the four previous taxable years. The burden to show this was upon petitioner, and it has failed to sustain such burden. Cf. *R. C. Harvey Co.*, 5 T. C. 431, 441.

The respondent argues that the write-off was obviously either an adjustment of selling price or a trade allowance, which adjustments are not "deductions" within the meaning of the statute, and, therefore, petitioner is not entitled to relief.

It is argued by petitioner that, whether the item is a deduction or part of the cost of sales, it goes to reduce the net taxable income of the taxpayer, and if it goes to reduce the net taxable income of the taxpayer and if it is abnormal under the provisions of section 711 (b) (1) (J) and (K), the taxpayer is entitled to relief.

Petitioner has failed, however, to show that the item regarded as a part of cost of sales was abnormal within the meaning of the statute. *Green Bay Lumber Co.*, 3 T. C. 824, does not support petitioner's position that it is immaterial under section 711 (b) (1) (J) whether or not the item involved is a statutory deduction. While it is stated therein that "Congress did not intend to limit classification of deductions for the purposes of subsection (J) to the 'statutory deduction categories' of section 23," it is also stated immediately following:

\* \* \* This is not to say we disapprove of find to be unsound the requirement of the regulation that "reference must be made to the deductions of the entire class rather than to any particular deductible items therein." We merely hold that bad debts do not all have to fall into a single class—a view, incidentally, specifically recognized by section 23 (k), I. R. C., which classifies bad debts into those coming within the "general rule," securities becoming worthless, nonbusiness debts, and securities of affiliated corporations. \* \* \*

The question therein involved was whether "two different kinds of bad debts may be put into separate classes." The item involved constituted an allowable bad debt deduction under section 23. Herein the evidence shows that the Robinson write-off did not constitute a bad debt in 1939 as defined in section 23 (k) (1). Clearly, section 711 (b) (1) (J) permits adjustment only of "deductions," abnormal, or normal, if abnormal in amount. The meaning of the statutory term "deductions" is well established. Without express enlargement of its usual meaning to include other items than those specified as deductions under the Internal Revenue Code, no item which is not shown to have been a statutory deduction may be adjusted under section 711 (b) (1) (J).

With respect to the write-off of $15,000 on the Zadek notes receivable account, petitioner contends that the write-off was a bad debt of a class normal for old Universal and out of the ordinary only in that it was excessive in amount.

The $15,000 written off represented the principal amount of a collateralized note dated May 27, 1938, payable in five years, with an agreement for monthly payments. The purpose of the execution of the note was to refund, as testified in effect by Sweeney, the balance in the notes receivable account as of January 1, 1938, of $9,505.87 and the amount of notes received thereafter but prior to May 27, 1938, of $5,494.13, or a total of $15,000. Sweeney testified that Zadek defaulted

on the note "almost off the bat, immediately." It was stipulated that Zadek was unable to pay its debts during 1939. The note may have been worthless prior to 1939 and hence was not properly includible in bad debts for the year 1939. The evidence indicates that it should have been deducted in 1938. Under subsection (K) (ii) of section 711, the taxpayer is required to establish that the excess is not a consequence of "a decrease in the amount of some other deduction in its base.period." The write-off made in 1939 may have been a reduction in the bad debt deduction in 1938. At least, petitioner has not established that it was not. As stated in *William Leveen Corporation*, 3 T. C. 593:

\* \* \* difficult as the proof of the negative may be, it is what the statute requires; and, since it is required in clear and express terms, its rigors may not be abated by softening construction.

Furthermore, it is alleged in the petition that before petitioner assumed the business of old Universal it engaged an accountant to examine the financial structure of old Universal; that such accountant reviewed the account of Max Zadek, Inc., and concluded that, in view of the financial condition of that company, the $15,000 note should be charged to profit and loss as a bad debt because he did not want to have any questionable assets on the balance sheet of the new company; and that the note was accordingly charged off and deducted on the 1939 return of old Universal. This indicates that the charge-off may have been a consequence of a change in the manner of operation of the business engaged in by the taxpayer. Petitioner has not established the contrary, as it is required to do under subsection (K) (ii) of section 711.

Upon the record made, petitioner is not entitled to adjustment of its bad debt deduction for 1939 as claimed.

The next question to be considered is whether the petitioner is entitled to a capital addition under section 713 (g) of the Internal Revenue Code.

.Section 713 (g) (3) defines "daily capital addition for any day of the taxable year" as the "aggregate of the amounts of money and property paid in for stock \* \* \* after the beginning of the taxpayer's first taxable year under this subchapter and prior to such day." The beginning of taxpayer's first taxable year was January 1, 1940.

Under date of December 30, 1939, all of the assets of old Universal, subject to all its liabilities except notes of the principal amount of $100,000 due to Bodell & Co., were transferred to petitioner in exchange for 150,000 shares of common stock and 10,000 shares of preferred stock of petitioner. This constituted all of the issued and outstanding stock of petitioner as of that date and as of January 1, 1940.

There is no evidence that any additional money or property, other than the assets of old Universal, was paid in to petitioner on or after January 1, 1940, for its stock.

The argument of petitioner that it should not lose the benefits of a capital addition because it could have adopted another form in the exchange of its stock for the assets of old Universal, under which petitioner would have assumed the liability of old Universal on the Bodell notes and issued its stock in payment of same, issuing less stock to old Universal, is without merit.

Petitioner issued all its outstanding stock to old Universal for all its assets, subject to its liabilities except the notes of Bodell & Co. This was a completed transaction. Old Universal then transferred and caused to be issued to Bodell & Co. some of the stock which it had received in payment of such notes. In connection with such transfer and issuance of a new certificate to Bodell & Co. for the stock transferred to it by old Universal, no money or property was paid in to petitioner. Petitioner merely canceled the certificates originally issued to old Universal and issued new certificates in their stead to the persons designated by old Universal, including Bodell & Co. This had no effect upon the amount of its outstanding capital stock or its assets.

Upon the evidence, petitioner is not entitled to a capital addition of $100,000 under section 713 (g).

*Decision will be entered for the respondent.*