*Decision will be entered under Rule 50.*

THE McKAY MACHINE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 55214. Filed April 26, 1957.

*James W. Frey, Esq.*, and *H. H. Hoppe, Esq.*, for the petitioner.
*Robert E. Johnson, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in the petitioner's income tax for the calendar year 1950 in the amount of $8,309.89. The primary issue is whether in computing the petitioner's

excess profits credit the petitioner is entitled to increase its base period net income by restoring to income for the year 1949 the amount of an inventory adjustment which the petitioner had taken with respect to certain machinery which the petitioner had produced under contract.

### FINDINGS OF FACT.

The petitioner is an Ohio corporation with principal office in Youngstown, Ohio. Its Federal income tax return for the year 1950 was filed with the collector of internal revenue for the eighteenth district of Ohio at Cleveland. It employs an accrual method of accounting and operates on a calendar year basis. It is a manufacturer of machinery. During the years 1945 through 1950 all of its manufacturing, with the possible exception of the manufacture of one or two sheet leveler machines, was done under contract with customers.

During the years of World War II petitioner had some contracts for delivery of goods to the Union of Soviet Socialist Republics (U. S. S. R.). Most of these contracts were obtained through the Treasury Department.

During the years 1946 through 1950 the petitioner had no contracts with any purchasing agent of the U. S. S. R. or any of its satellite countries, except one which was executed on October 25, 1946, with V. O. Machinoimport, a purchasing agent of the U. S. S. R., created and existing under the laws of the U. S. S. R. with main office in Moscow and a suboffice in Washington, D. C. Under the contract the petitioner undertook to manufacture, according to the purchaser's specifications, all of the material and equipment for the erection and operation of an atomic hydrogen weld tube mill, to be erected by the purchaser in the U. S. S. R. The total contract price was $600,000, and it was provided that the delivery should be completed not later than November 30, 1947. Such date could be changed only by written consent of the purchaser. The petitioner was to deliver the material and equipment for the mill f. o. b. its plant, packed for export shipment to the U. S. S. R. It was provided that if by reason of a law of the United States or for any other reason beyond the petitioner's control the equipment could not be shipped from the plant, payment was to become due as if the equipment had been shipped.

Pursuant to section 6 of the National Defense Act (Act of July 2, 1940, 54 Stat. 712), governmental regulations were issued requiring the application for a license to export the type of machinery covered by the contract in question. (8 Fed. Reg. 1494; 10 Fed. Reg. 4418–4490.) By October 25, 1946, when the petitioner entered into its contract, this type of machinery had been removed from the restricted

commodity list and could have been exported under a general license without the necessity for application. (10 Fed. Reg. 11793.) However, such regulations were amended, effective March 1, 1948 (13 Fed. Reg. 1120), and thereafter an individual license was required for export of machinery of this type.

The mill was not completed and ready for shipment at the time specified and it had not been completed by March 1, 1948, when the Government regulations were promulgated requiring application for an export license. Machinoimport would have accepted the machinery in 1948 and 1949 if the petitioner had been able to export it to Russia. However, without an export license, the railroads would not have accepted the material for shipment to any port.

On February 24, 1948, the petitioner made application for an export license to ship the machinery in question to the U. S. S. R., but such application was denied on August 16, 1948. An appeal was taken by the petitioner on September 7, 1948, but such appeal was verbally denied at sometime in 1949 prior to October, and was formally denied on March 8, 1950. During the year 1949, the petitioner was advised that Machinoimport had closed its offices in this country and had returned to Moscow.

Machinoimport had made an advance payment of $270,234, but thereafter paid nothing further to the petitioner for any of the goods which had been produced under the contract.

Throughout the years 1945 to 1950 the inventory on the petitioner's books was carried at the lower of cost or market value and the tax returns were filed on that basis, but there was generally no occasion for reducing the inventory below cost since practically all of the petitioner's production was done under contract. However, if the costs should exceed the contract price, the inventory would be adjusted downward. The inventory consisted of three classifications, namely, raw materials, labor in process, and manufacturing expense in process. It has been the petitioner's practice to take an actual or physical inventory once each year and to make proper correction by adjusting journal entries to reflect any difference between the inventory shown on the books and the inventory actually on hand at the end of each year. This is necessary because of spoiled materials, material charge-outs, etc. The inventory is adjusted either downward or upward as required and corresponding debits or credits are made to labor, material consumed, and manufacturing expense absorbed. In the event of a downward adjustment of inventory and a debiting of these accounts, the result is an increase in cost of goods sold.

The inventory adjustments made by the petitioner, by way of reduction (and the average of such annual inventory adjustments), for the years 1945 through 1948 were as follows:

| | |
|---|---|
| 1945 | $3,028.94 |
| 1946 | 13,524.90 |
| 1947 | 4,423.96 |
| 1948 | 42,251.86 |

| | |
|---|---|
| Total inventory adjustments for 1945 through 1948 | 63,229.66 |
| Average of annual inventory adjustments | 15,807.42 |

Prior to the 1949 year-end adjustment the work in process under the Russian contract was carried in the inventory as follows:

| | |
|---|---|
| Material | $325,081.66 |
| Labor in process | 54,532.27 |
| Manufacturing expense in process | 40,899.24 |

420,513.17

In view of the fact that no export license could be procured for shipment of the machinery to Russia and Machinoimport would not accept delivery in this country and pay the remainder of the contract price of this machinery, and because Machinoimport had closed its offices in this country and returned to Moscow, the petitioner concluded that it would not recover the costs it had incurred under the contract. In consequence thereof at December 31, 1949, it made entries in its general journal reducing its inventory by a net figure which reflected, on account of the Russian contract, a reduction of raw material by the amount of $61,649.19, labor in process by the amount of $9,679.97, and manufacturing expense in process by the amount of $7,260.01, a total of $78,589.17. Corresponding changes were made to the profit and loss account. These entries resulted in an increase in the cost of goods sold by that amount and such increase was reflected in its income tax return for 1949.

In arriving at the total 1949 year-end inventory reduction of $78,589.17, the petitioner determined what machinery could be resold and the price which could be obtained therefor. It then determined what machinery could not be sold but would have to be scrapped. It then multiplied the number of tons of scrap steel involved by $30 per ton, which was the market value at that time. The total amount recoverable from these sources was determined to be $61,690. It then added the advance payment of $270,234 to such resale and scrap values and arrived at a figure of $341,924 as the total amount realized and to be realized for the work under the Russian account. It then subtracted that figure from the cost of production under the contract as reflected in the inventory, namely, $420,513.17, which left the amount of $78,589.17 as the amount of the inventory reduction.

In its income tax return for the year 1950, the petitioner, in determining its excess profits credit, used the so-called growth formula provided for in section 435 (e) of the Internal Revenue Code of 1939 and determined the average base period net income based upon its

net income for the year 1949. In determining its average base period net income the petitioner claimed that its inventory adjustment of $78,589.17 in 1949 on its contract with Machinoimport was an abnormal deduction within the meaning of section 433 (b) (9) and claimed that the only other adjustment of such classification made during the preceding 4 years was in 1948 when the petitioner had made another adjustment with respect to its contract with Machinoimport in the amount of $38,513.02. In its return the petitioner made the following explanation:

The net inventory value of the machinery referred to above, as of December 31, 1948, was $388,859.11, and additional costs incurred in 1949 brought this figure up to $420,513.17. At December 31, 1949, in the light of further study and information then available as to the actual value of the materials and finished products for resale and/or use in the taxpayer's plant, the following write-downs were made and included in cost of sales:

| | |
|---|---:|
| Materials in process | $61,649.19 |
| Labor in process | 9,679.97 |
| Manufacturing expenses in process | 7,260.01 |
| | 78,589.17 |

The net abnormal deduction is computed as follows:

| | | |
|---|---:|---:|
| Abnormal deduction in 1949 | | $78,589.17 |
| Average amount of deductions of the same class during the four preceding taxable years: | | |
| 1946 [1] | 0 | |
| 1947 | 0 | |
| 1948 | 0 | |
| 1949 | $38,513.02 | |
| Total | 38,513.02 | |
| Average | 9,628.26 | |
| 11.5% of average | | 11,073.65 |
| Net abnormal deduction | | 67,515.52 |

There were no deductions of the same class in the taxable year.

By virtue of the petitioner's determination of its excess profits credit for the year 1950, it reported in its return for that year that no excess profits taxes were due.

The 1948 year-end inventory adjustment of $38,513.02 consisted in part of engineering costs on the Machinoimport contract, and in part of excess of cost of production over contract price. This adjustment was in conformity with the normal practice of the petitioner with regard to production under any contract. The adjustment was of the same nature as other inventory adjustments made in other years.

In the notice of deficiency the respondent determined that the pe-

---

[1] Obviously, since the $38,513.02 adjustment was made in 1948, the petitioner intended to refer to the years 1945 through 1948. Also, obviously, the percentage of 11.5, was intended to be 115 per cent.

titioner in computing its excess profits credit was not entitled to the adjustment of $67,515.52 with the following statement:

On your return for the year ended December 31, 1950 you claimed an excess profits credit of $626,503.59 representing 85% of the sum of $737,063.05 shown as the excess profits net income for the last 12 months in the base period. Said sum of $737,063.05 includes an adjustment of $67,515.52 for an alleged abnormal deduction which has been eliminated since it is an inventory adjustment and not an abnormal deduction.

The elimination of $67,515.52 results in excess profits net income of $669,547.53 for the last 12 months in the base period and 85% thereof, or $569,115.40, is the allowable excess profits credit.

### OPINION.

The basic question presented is whether, in determining the petitioner's average base period net income for the purpose of computing its excess profits tax credit under the income method for the taxable year 1950, it is entitled to an adjustment of its 1949 income by restoring thereto the amount of $78,589.17 or any part thereof as an abnormal deduction pursuant to the provisions of section 433 (b) (9) and (10) of the Internal Revenue Code of 1939, as added by section 101 of the Excess Profits Tax Act of 1950.[2]

The amount above referred to is the amount which the petitioner excluded from its income for 1949 on account of the contract with

---

[2] SEC. 433 (b). TAXABLE YEARS IN BASE PERIOD.—For the purposes of computing the average base period net income, the excess profits net income for any taxable year shall be the normal-tax net income, as defined in section 13 (a) (2) as in effect for such taxable year, increased or decreased by the following adjustments * * *

* * * * * * *

(9), JUDGMENTS, INTANGIBLE DRILLING AND DEVELOPMENT COSTS, CASUALTY LOSSES, AND OTHER ABNORMAL DEDUCTIONS.—If, for any taxable year or years within, or beginning or ending within, the base period, any class of deductions for the taxable year exceeded 115 per centum of the average amount of deductions of such class for the four previous taxable years (not including deductions arising from the same extraordinary event which gave rise to the deduction for the taxable year), the deductions of such class shall, subject to the rules provided in paragraph (10), be disallowed in an amount equal to such excess. For the purposes of this paragraph, each of the following groups of deductions shall constitute a class of deductions:

(A) Deductions attributable to claims, awards, judgments, and decrees against the taxpayer, and interest on the foregoing ;

(B) Deductions attributable to intangible drilling and development costs paid or incurred in or for the drilling of wells or the preparation of wells for the production of oil or gas, and for development costs in the case of mines ; and

(C) Deductions under section 23 (f) for losses arising from fires, storms, shipwreck, or other casualty, or from theft, or arising from the demolition, abandonment, or loss of useful value of property, not compensated for by insurance or otherwise. The class of deductions under this subparagraph for any taxable year shall not include deductions which are excludible under paragraph (2) or which would be so excludible if such paragraph were applicable with respect to such taxable year.

The classification of deductions of any class not described in subparagraphs (A) to (C), inclusive, shall be subject to regulations prescribed by the Secretary.

(10) RULES FOR APPLICATION OF PARAGRAPH (9).—For the purpose of paragraph (9)—

* * * * * * *

(C) Deductions of any class shall not be disallowed under such paragraph unless the taxpayer establishes that the increase in such deductions—

* * * * * * *

(ii) is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

V. O. Machinoimport. On October 25, 1946, the petitioner contracted to manufacture and sell an atomic mill to Machinoimport, according to its specifications, for $600,000. In October 1949, before manufacture of the mill had been completed, it was finally determined that the petitioner would not be able to obtain an export license therefor. The petitioner in 1949 carried in its inventory an amount of $420,-513.17 as work in process on this contract. It already had received an advance payment of $270,234. In addition, some of the machinery produced was salable and some had a salvage value, the total recoverable value being $71,690. Since Machinoimport would not accept delivery in this country and pay the remainder of the purchase price, the petitioner made a year-end adjustment to its inventory in the amount of $78,589.17, which was computed by totaling the advance payment and the amounts recoverable, and subtracting the sum of those amounts from the amount of $420,513.17 carried in the inventory. This had the effect of increasing the cost of goods sold in 1949 and thereby reducing the amount of taxable income for that year. This increase was reflected in the petitioner's return for the year 1949 and was not disturbed by the respondent.

The respondent takes the position that this item cannot be considered an abnormal deduction under section 433 (b) (9). It is his position that the statute contemplates the type of deductions provided in section 23 and does not encompass an item such as this, which is an inventory adjustment affecting the cost of goods sold. He states that this adjustment amounted to no more than a reduction of the year-end inventory to the lower of cost or market value in accordance with the method which the petitioner had elected to use.

The petitioner on the other hand takes the position that section 433 (b) (9) is a relief provision and that to accomplish the purpose of that section the inventory adjustment which it made in 1949 should be considered as an abnormal deduction under that section. It argues, first, that the adjustment of the 1949 inventory in the amount of $78,589.17 is a class of deductions theretofore unknown by it and should therefore be eliminated from 1949 income in toto; and, second, that if it was not an abnormal deduction in the full amount, nevertheless it should be eliminated to the extent that it exceeded 115 per cent of average annual inventory adjustments for the years 1945 through 1948, which average amounted to $15,807.42.

The petitioner refers to the case of *Green Bay Lumber Co.*, 3 T. C. 824, in which we stated that a provision of the World War II excess profits tax statute (sec. 711 (b) (1) (J), I. R. C. 1939, as added by the Second Revenue Act of 1940), relating to the disallowance of "abnormal deductions," was remedial in nature and should have a reasonable and rational construction in order that it may give the

relief it was intended to provide. The petitioner makes particular reference to the statement therein that "Congress did not intend to limit classification of deductions for the purposes of subsection (J) to the 'statutory deduction categories' of section 23." This statement, however, had reference to whether different types of bad debts could be considered as constituting different classifications for purposes of the statute. That case does not hold that an adjustment not falling within the deduction provisions of the statute may be treated as an abnormal deduction under the provisions of section 711 (b) (1) (J). Our holding in that case is summarized in the following statement in the Opinion (p. 831) :

We merely hold that bad debts do not all have to fall into a single class—a view, incidentally, specifically recognized by section 23 (k), I. R. C., which classifies bad debts into those coming within the "general rule," securities becoming worthless, nonbusiness debts, and securities of affiliated corporations. * * *

This subject was reviewed in the case of *Universal Optical Co.*, 11 T. C. 608, 621, where we concluded as follows:

Clearly, section 711 (b) (1) (J) permits adjustment only of "deductions," abnormal, or normal, if abnormal in amount. The meaning of the statutory term "deductions" is well established. Without express enlargement of its usual meaning to include other items than those specified as deductions under the Internal Revenue Code, no item which is not shown to have been a statutory deduction may be adjusted under section 711 (b) (1) (J).

In other cases we have consistently adopted the view that the word "deductions" in the phrase "abnormal deductions" is confined to deductions under section 23 of the Code. See *Tri-State Beverage Distributors, Inc.*, 27 T. C. 1026. The basis upon which we have sustained claimed disallowances has been that they initially fell within one of the categories listed in section 23. In *Wentworth Manufacturing Co.*, 6 T. C. 1201, some of the items as to which we held disallowances were proper were expenses of advertising, costs of telephone and telegrams, State unemployment insurance taxes, and bad debts, all of which are comprehended within the deductions listed in section 23. In *Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350, the disallowances which we held to be proper concerned salaries and interest, both of which are section 23 deductions. The case of *Mine & Smelter Supply Co.*, 10 T. C. 1179, involved a stock bonus to employees which is an item that clearly comes within the compensation provisions of section 23.

Inventory adjustments are not comprehended within the provisions of section 23 which allows deductions from gross income for the purpose of arriving at the amount of net income. Inventory adjustments are made under section 22 for the purpose of reducing the amount of gross receipts to the amount of gross income. This is the basic theory

under which gross income is determined. *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179.[3]

The statute and the regulations with which we are concerned in this case specifically provide for the use of inventories in the determination of gross income. Sec. 22 (c), I. R. C. 1939; Regs. 111, sec. 29.22 (c), particularly subsecs. (c) (1) to (c) (4).

Following the pattern of the statute we have consistently held that inventory adjustments are adjustments of the cost of goods sold, and as such are not within the class of items which are deductions from gross income. *Universal Optical Co., supra; Crow-Burlingame Co.*, 15 T. C. 738, dismissed on stipulation (C. A. 8) 192 F. 2d 574; *Colorado Milling & Elevator Co.*, 17 T. C. 1280, appeal dismissed (C. A. 10) 205 F. 2d 551.

Although the authorities cited arose under the World War II Excess Profits Tax Act, the wording and structure of that statute and the one before us are essentially the same, and the interpretation applied to the word "deductions" in the earlier statute we think must also be used in reference to the same word in the later statute. Congress, as shown by the committee reports, in enacting the Excess Profits Tax Act of 1950, deliberately adopted provisions similar to those of the World War II Act. In speaking of section 433 (b) (9) the Senate Finance Committee said in part:

This provision is similar to the corresponding portion of the World War II law except that the latter eliminated only the excess over 125 percent of the average of the deductions for the four previous taxable years, and did not include the 5 percent limitation described above. [S. Rept. No. 2679, 81st Cong., 2d Sess., 1951-1 C. B. 251.]

We find the words "deduction" or "deductions" used repeatedly throughout section 433 as in subsections (b) (1), (b) (4), and (b) (10) (B) and (C). On the other hand, in other parts of the statute other terms affecting income are used such as "exclusion," "allowance," and "credit." This selection of terms is indicative that Congress used the term "deductions" in its commonly understood sense of the items specified in section 23 as constituting deductions from gross income.

We accordingly hold that the adjustment in question did not constitute an abnormal deduction under section 433.

The petitioner makes the alternative contention that if no part of the 1949 inventory adjustment may be disallowed as an abnormal deduction under the provisions of section 433 (b) (9), then the adjust-

---

[3] In that case the provisions of Treasury Regulations 31 were described in part as follows:

These prescribed, with respect to manufacturing companies, that gross income should consist of the difference between the price received for the goods as sold and the cost of such goods as manufactured; cost to be "ascertained by an addition of a charge to the account of goods as manufactured during the year of the sum of the inventory at begining of the year and a credit to the account of the sum of the inventory at the end of the year." * * *

ment in 1949 was erroneous in that there had been no realized loss in that year, and that the amount of the adjustment should be restored in determining average base period net income. To support this argument it relies in part on that provision of the regulations which excludes from valuation at "market" the following:

goods on hand or in process of manufacture for delivery upon firm sales contracts (i. e., those not legally subject to cancellation by either party) at fixed prices entered into before the date of the inventory, under which the taxpayer is protected against actual loss, which goods must be inventoried at cost. [Regs. 111, sec. 29.22 (c)–4.]

As we see it, that provision of the regulations is not applicable here since the contract involved under the circumstances did not protect the petitioner against actual loss.

By the end of 1949 the petitioner's application for an export license had been refused and its appeal therefrom had been verbally denied. The purchaser had left the country. There was no market for the mill as such. The market or realizable value of component parts was less than their cost as carried in the inventory. Such parts thus were similar to obsolete or damaged merchandise. It has often been held that the proper method of accounting for such merchandise by a taxpayer employing inventories is to reduce closing inventory to reflect its value. *Templeton, Kenly & Co., Ltd.*, 6 B. T. A. 61; *Wilson Furniture Co.*, 10 B. T. A. 1294; *Justus & Parker Co.*, 13 B. T. A. 127. Accordingly, we see no error in the petitioner's reduction of 1949 inventory on account of the Machinoimport transaction and therefore no reason for restoring the amount of the adjustment to income for the year 1949.

In view of our holding on the issue presented by the petition and answer we do not reach an alternative question raised by the respondent's amended answer as to whether the petitioner has taken an inconsistent position which would sustain a claim for an increased deficiency for the year 1950.

*Decision will be entered for the respondent.*