*Decision will be entered under Rule 50.*

RYAN CONSTRUCTION CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FEIGEL CONSTRUCTION CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 58802, 58803. Filed May 23, 1958.

*Stuart E. White, Esq.*, for petitioners.
*Towner S. Leeper, Esq.*, for the respondent.

OPINION.

PIERCE, *Judge:* Respondent determined deficiencies in excess profits tax in these two cases which were consolidated for trial, as follows: In Docket No. 58802 (Ryan Construction Corporation), $9,642.47 for

the fiscal year ended February 29, 1952; in Docket No. 58803 (Feigel Construction Corporation), $3,780 for the calendar year 1951.

One of the issues in Docket No. 58802, which was raised by amended petition, has been conceded by the respondent.

The sole question for decision in each of the cases is whether payments made by each petitioner to the widow of its deceased president, as a memorial, are abnormal deductions which should be eliminated in the petitioner's base period years in computing its excess profits tax credit for the taxable year, pursuant to sections 433 (b) (9) and 433 (b) (10) (C) (i) and (ii), I. R. C. 1939.[1]

All facts were submitted on a stipulation of facts and jointly introduced exhibits. Said stipulation and exhibits are incorporated herein by this reference and constitute our findings of fact. The material portions of the same may be summarized as follows:

Both petitioners are Indiana corporations. Ryan Construction Corporation (hereinafter sometimes called Ryan) was engaged in the business of construction and earth moving; and Feigel Construction Corporation (hereinafter sometimes called Feigel) was engaged in the paving and construction business. Each corporation filed its income and excess profits tax return for its taxable year involved, with the collector of internal revenue for the district of Indiana, at Indianapolis. Ryan kept its books and filed its returns on the basis of fiscal years ending on the last day of February, while Feigel was on a calendar year basis. Both Ryan and Feigel used the completed contract method of accounting.

Roy and Mike Ryan, who were brothers, had since about 1923 been engaged in the construction business. From 1934 to 1940, during which time their business grew and prospered, they operated as a partnership. In 1940, they organized the Ryan Construction Cor-

---

[1] SEC. 433. EXCESS PROFITS NET INCOME.

(b) TAXABLE YEARS IN BASE PERIOD.—For the purposes of computing the average base period net income, the excess profits net income for any taxable year shall be the normal-tax net income * * * increased or decreased by the following adjustments * * *:

\* \* \* \* \* \* \*

(9) JUDGMENTS, INTANGIBLE DRILLING AND DEVELOPMENT COSTS, CASUALTY LOSSES, AND OTHER ABNORMAL DEDUCTIONS.—If, for any taxable year or years within, or beginning or ending within, the base period, any class of deductions for the taxable year exceeded 115 per centum of the average amount of deductions of such class for the four previous taxable years (not including deductions arising from the same extraordinary event which gave rise to the deduction for the taxable year), the deductions of such class shall, subject to the rules provided in paragraph (10), be disallowed in an amount equal to such excess. * * *

(10) RULES FOR APPLICATION OF PARAGRAPH (9).—For the purpose of paragraph (9)—

\* \* \* \* \* \* \*

(C) Deductions of any class shall not be disallowed under such paragraph unless the taxpayer establishes that the increase in such deductions—

(i) is not a cause or a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, which increase or decrease is substantial in relation to the amount of the increase in the deductions of such class, and

(ii) is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

poration which acquired their partnership assets. Thereafter, in 1942, these brothers purchased the controlling interest in Feigel. Through the personal efforts of Roy and Mike, the corporations obtained numerous profitable contracts and expanded their operations. Roy was president of both corporations until January 1, 1948, when he was killed in a train wreck. Thereupon Mike succeeded him.

As regards stockholdings in the two petitioner corporations, Roy was the majority stockholder of Ryan from the time of its incorporation until 1945, when he transferred sufficient shares to Mike to give him control. Feigel had outstanding 210 shares of common stock and 196 shares of preferred stock; and from 1942 through 1947, Roy and Mike each owned 88 shares of common and 84 shares of preferred. Upon Roy's death, all his shares of stock in both corporations descended to his wife and children.

On January 13, 1948, following Roy's death, the board of directors of Ryan adopted the following resolution:

> Resolved that this Corporation pay to Carrie E. Ryan, widow of the late Roy Ryan, Sr., the sum of Fifty Thousand Dollars ($50,000.00) which sum represents two years salary of Mr. Ryan as president of the corporation. Said sum to be payable in twenty-four monthly payments of $2,083.33 each, beginning with the month of January 1948, and continuing through the month of December 1949. This sum payable to Mrs. Ryan as a memorium [sic] and in recognition of the long and faithful services rendered by said Roy Ryan, Sr., as president of this Corporation.

On the same date the board of directors of Feigel adopted a similar resolution, as follows:

> Resolved, that the Feigel Construction Corporation pay to Carrie E. Ryan, widow of Roy Ryan, the sum of $1,250.00 per month beginning with the month of January 1948 and continuing for a two year period through the month of December 1949 as a memorium [sic] and in recognition of the valuable services rendered by Roy Ryan to said corporation. This resolution was passed by all voting directors, Carrie E. Ryan not voting.

Pursuant to such resolutions, Roy's widow, Carrie Ryan, received from Ryan Construction Corporation $4,166.66, $25,000, and $20,833.34 in its base period fiscal years ending February 28 or 29, 1948, 1949, and 1950; and she received from Feigel Construction Corporation $15,000 in each of its base period calendar years 1948 and 1949.

Both Ryan and Feigel deducted said payments to Carrie E. Ryan, in their income tax returns for the above-mentioned base period years, as a business expense. The Commissioner initially denied such deductions, on the ground that the payments had no reasonable relationship to the services rendered by Roy Ryan; but subsequently he conceded allowance of the same in full, in prior proceedings before this Court.

The amounts of officers' salaries paid by Ryan Construction Corporation from 1942 through 1952, were as follows:

| Year ended Feb. 28 or 29 | Roy Ryan [1] | Mike Ryan | Year ended Feb. 28 or 29 | Roy Ryan [1] | Mike Ryan |
|---|---|---|---|---|---|
| 1942 | $25,000.00 | $25,000.00 | 1948 | $20,833.33 | $25,000.00 |
| 1943 | 40,000.00 | 40,000.00 | 1949 | | 25,000.00 |
| 1944 | 40,000.00 | 40,000.00 | 1950 | | 25,000.00 |
| 1945 | 40,000.00 | 40,000.00 | 1951 | | 43,145.19 |
| 1946 | 25,000.00 | 25,000.00 | 1952 | | 73,056.02 |
| 1947 | 25,000.00 | 25,000.00 | | | |

[1] Served as president until his death on Jan. 1, 1948; succeeded by Mike Ryan.

The amounts of officers' salaries paid by Feigel Construction Corporation from 1942 through 1952, were as follows:

| Year | Roy Ryan [1] | Mike Ryan | J. R. Feigel | Year | Roy Ryan [1] | Mike Ryan | J. R. Feigel |
|---|---|---|---|---|---|---|---|
| 1943 | $15,000 | $15,000.00 | $10,868.43 | 1948 | | $15,000.00 | $16,160.60 |
| 1944 | 15,000 | 15,000.00 | 10,452.65 | 1949 | | 15,000.00 | 12,416.00 |
| 1945 | 12,500 | 12,500.00 | 7,758.33 | 1950 | | 31,440.10 | 26,925.14 |
| 1946 | 15,000 | 15,000.00 | 11,323.83 | 1951 | | 31,285.42 | 26,925.14 |
| 1947 | 15,000 | 15,000.00 | 11,431.80 | 1952 | | 31,125.35 | 26,925.14 |

[1] Served as president until his death; succeeded by Mike Ryan.

Ryan Construction Corporation's gross income for the years 1946 through 1954 was as follows:

| Year ended February 28 or 29 | Gross income [1] | Year ended February 28 or 29 | Gross income [1] |
|---|---|---|---|
| 1946 | $92,158.17 | 1951 | $472,070.16 |
| 1947 | 270,755.23 | 1952 | 561,474.65 |
| 1948 | 172,949.95 | 1953 | 803,774.45 |
| 1949 | 365,357.81 | 1954 | 471,789.92 |
| 1950 | 273,412.44 | | |

[1] Difference between gross receipts and direct construction costs.

Feigel's gross income for the same period, 1946 through 1954, was:

| Year | Gross income [1] | Year | Gross income [1] |
|---|---|---|---|
| 1946 | $153,483.66 | 1951 | $297,618.37 |
| 1947 | 147,048.38 | 1952 | 298,404.05 |
| 1948 | 223,999.81 | 1953 | 256,894.45 |
| 1949 | 157,576.60 | 1954 | 271,918.66 |
| 1950 | 230,174.11 | | |

[1] Difference between gross receipts and direct construction costs.

Following Roy's death, his heirs and Mike continuously disagreed over petitioners' management policies. As a result, Mike in 1952 bought all of the shares of Roy's family in both corporations. Subsequently, in 1954 or shortly thereafter, Ryan Construction Corporation was liquidated.

Each petitioner corporation, in computing its excess profits net income for the base period years and in establishing its excess profits credit for the taxable year involved, eliminated or added back to its normal tax net income for certain of the base period years,[2] as abnormal deductions, the amounts paid to Carrie Ryan in those years, pursuant to the above-mentioned resolutions; and it thereby increased its excess profits credit, and reduced its excess profits tax liability. The respondent, however, in his notice of deficiency to each petitioner, determined that the payments to Carrie should not be eliminated through application of section 433 (b) (10) (C).[3]

In *Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350, this Court held that gratuity payments made by a corporation to widows of its deceased employees constituted a class of deductions which was "separate and distinct" from the deductions for "routine salaries." In the instant case, the parties have stipulated that the payments made by each of the petitioner corporations in 1948, 1949, and 1950 to the widow of its deceased president, were in excess of 115 per cent of the average amount of any payments of such class for the 4 previous taxable years; and it is evident therefore that the deductions taken for such payments qualify as "abnormal deductions" within the meaning of section 433 (b) (9). Thus, in such situation, the issue before us is reduced to the narrow question of whether these deductions, even though they are abnormal, should not be eliminated under the provisions of subparagraphs (C) (i) and (ii) of section 433 (b) (10). These subparagraphs provide, in substance and so far as here material, that deductions of any class, even though they are abnormal, shall not be eliminated unless the taxpayer establishes that the increase in such deductions—

(a) Is not a cause or a consequence of an increase in the gross income of the taxpayer in its base period years;

(b) Is not a cause or a consequence of a decrease in the amount of some other deduction in its base period years; and

(c) Is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

We think that petitioners have successfully borne their burden of proof as to each of these provisions.

1. As regards the first provision, which raises the question of whether the payments to Carrie were a cause or consequence of an

---

[2] Because the amount which Ryan paid Carrie in its fiscal year 1948 ($4,166.66) was less than 5 per cent of its average excess profits net income, it did not add back such payment to its excess profits net income for such year. See sec. 433 (b) (10) (B). However, for the base period fiscal years 1949 and 1950 in the case of Ryan, and for the base period calendar years 1948 and 1949 in the case of Feigel, the payments to Carrie exceeded the requisite 5 per cent of the average excess profits net income, and were added back.

[3] The respondent, in his original answer to the petition of each corporation, relied only on subparagraph (C). (i) of said section; but thereafter, in amended answers, he indicated reliance also on subparagraph (C) (ii).

increase in gross income, respondent argues (1) that prior to Roy's death, he performed services for each of the petitioners, which caused increases in their gross incomes; (2) that petitioners paid Carrie for such services of Roy; and (3) that the payments for such services bore the cause or consequence relationship to the increased gross incomes, which is comprehended by section 433 (b) (10) (C) (i).

We find no merit in such argument. It is true that the increased gross income of each petitioner was, in part, traceable to Roy's services in procuring construction contracts upon which profits were realized in the base period years that followed Roy's death. But, by no stretch of the imagination, can the payments to Carrie be regarded as a *cause* of such gross income increases.

Also, we are satisfied that the payments to Carrie were not a *consequence* of such increased gross income. Rather, they were a consequence of Roy's death and of the decision of petitioners' boards of directors to pay to Carrie a gratuity, as a memorial to Roy. Had Roy continued to live any increased compensation to him might conceivably have been a consequence of the increased gross income which his services produced. But the sums paid to Carrie were not compensation to anyone, for Carrie was not an employee, and Roy had been fully compensated prior to his death. Although the amounts of the gratuities paid to Carrie happened to be measured by what had been Roy's salary, the legal result is no different than if they had been determined in some other manner, without regard to his salary rate. Nothing in the wholly stipulated record indicates, or tends to indicate, that either petitioner was in any way obligated to make or did make any further payment in respect of Roy's services, or that its gross income had any relationship to the gratuity payments to his widow.

2. The second of the above-mentioned provisions of the statute raises the question of whether the payments to Carrie were a cause or consequence of a decrease in some other deduction. Respondent argues, in regard to this, (1) that petitioners voted to pay Roy's salary to Carrie, for a period of 2 years; (2) that their officer salary accounts and their payments to Carrie fluctuated in converse unison, one decreasing as the other increased, as is shown by the tables above set forth; and (3) that this relationship between the accounts is within that portion of section 433 (b) (10) (C) (i) which pertains to a decrease in some other deduction.

Here again, we must reject respondent's argument. The reduction in the officers' salary accounts of the petitioners was caused by Roy's death, and not by the payment of the gratuities to Carrie. Both the reduction in the officers' salary accounts and the payments to Carrie stemmed from Roy's death, but this does not make the gratuity payments the cause or consequence of the reduced salaries.

The two accounts did fluctuate in converse unison, because Roy had died and no one was employed to replace him, and also because the amount of the gratuity to Carrie happened to be fixed in relation to his former salary. The fluctuation in the two accounts was parallel, but there was no cause or consequence relationship between them.

The authorities relied upon by respondent in connection with this point are readily distinguishable. In the first case cited, *Concord Cab Corporation*, 18 T. C. 1009, the taxpayer had used the declining balance method in depreciating its taxicabs and meters; and this method had resulted in a deduction which was abnormal, as to amount, for its first base period year. This Court refused, however, to eliminate the excess portion of such abnormal deduction, and stated:

deductions for depreciation allowed for each of the four base period years * * * were part of an integral plan, were interdependent, and were mutually consequential. * * * Thus, the deduction taken in each year was a consequence of an integral plan involving, as components, the deductions for the other years, and each deduction was dependent upon and a result of the other. If any one was large, that was a consequence of smaller ones being taken in other years. * * *

In the instant case, there was no integral plan embracing, as components, the payments of the gratuities to Carrie and the decrease in officers' salaries; and the two accounts were not interdependent or mutually consequential.

The second case relied upon by respondent is *R. C. Harvey Co.*, 5 T. C. 431. There, we suggested that an abnormal deduction for a lump-sum payment made to a former purchasing agent in settlement of a lawsuit for breach of a contract of employment, might have been the cause of a subsequent decrease in the commissions paid to a successor purchasing agent. Obviously, the lump-sum settlement and the decreased commissions were closely related, because the functions and services of both the party settled with and his successor were the same. No similar close relationship exists in the case at bar, between the amounts paid to Carrie, which were gratuities, and the amounts paid to petitioners' officers, which were for personal services.

As before stated, we regard both of the above-mentioned cases to be distinguishable from the present case.

3. We come now to the last provision of section 433 (b) (10) (C), which gives rise to the question of whether the payments of the gratuities to Carrie were a consequence of a change at any time in the type, manner of operation, size, or condition of the businesses engaged in by the petitioners. We are satisfied that they were not.

In the first place, no change in the type, manner of operation, or size of the business of either petitioner occurred at any time. Both petitioners engaged in the same *type* of business after the death of

Roy as they had before; and there was no substantial change in the *size* of either. Also, both petitioners employed the same *manner of operation*. Mike had been active in the affairs of Ryan since its incorporation, and active in the affairs of Feigel since he and Roy acquired the controlling interest therein in 1942; and he had been the majority stockholder in Ryan since 1945. His activities had included both the procurement of contracts for each petitioner and participation in the management of each. It is our opinion that, in the light of such circumstances, Mike's election as president of each corporation after Roy's death, did not constitute any change in the manner of operation of either business.

As for any change in the *condition* of the business, the only such change which conceivably could be here relevant was the purchase by Mike, in September 1952, of all shares of each corporation that were held by members of Roy's family, and the subsequent liquidation of Ryan. But the gratuities paid to Carrie had been authorized almost 5 years prior to such change, and all payments of these gratuities had been completed almost 3 years prior thereto. Accordingly, such payments could not possibly have been a *consequence* of said change occurring in later years; and, even if they might have been a *cause* of the change (which is in no way shown or suggested by the record), it is to be observed that subparagraph (C) (ii) of section 433 (b) (10), with which we are here concerned, speaks only in terms of *consequence* and not of *cause*. We must take the statute as we find it. *R. C. Harvey Co., supra.*

In *Arrow-Hart & Hegeman Electric Co., supra*, we held that payments to widows of the taxpayer's deceased employees were not a consequence[4] of either an increase in gross income, or of a decrease in some other deduction, or of a change in the type, manner of operation, size, or condition of the business. The facts in the present case are similar to those in the *Arrow-Hart* case; and we adhere to the holding there made. In the instant case we further hold, for the reasons above stated, that the payments made to the widow here involved were not a *cause*, either of an increase in gross income or of a decrease in some other deduction of either petitioner corporation.

By reason of all the foregoing, we decide the present issue in favor of the petitioners.

> *Decision will be entered under Rule 50 in Docket No. 58802.*
>
> *Decision will be entered for the petitioner in Docket No. 58803.*

---

[4] The *Arrow-Hart & Hegeman* case involved section 711 (b) (1) (K) (ii) of the now repealed World War II xcess Profits Tax Law. This section required the taxpayer to prove only that the abnormal deduction was not a *consequence* of the specified factors, and made no reference to *cause*.